1    James L. Davis, Jr. (CSB # 304830)
     james.l.davis@ropesgray.com
2    ROPES & GRAY LLP
     1900 University Avenue, 6th Floor
3    East Palo Alto, California 94303-2284
     Telephone: (650) 617-4000
4    Facsimile: (650) 617-4090

5    Richard T. McCaulley, Jr. (*pro hac vice*)
     richard.mccaulley@ropesgray.com
6    ROPES & GRAY LLP
     191 North Wacker Drive, 32nd Floor
7    Chicago, IL 60606-4302
     Telephone:  (312) 845-1200
8    Facsimile:  (312) 845-5500

9    *Attorneys for Defendants*
     *MEDTRONIC, INC. and*
10   *MEDTRONIC MONITORING, INC.*

11

12                   **UNITED STATES DISTRICT COURT**

13                   **NORTHERN DISTRICT OF CALIFORNIA**

14                          **OAKLAND DIVISION**

15   _____
                                      )
16   CRANDALL TECHNOLOGIES LLC, a     )    Case No. 4:17-cv-03664-HSG
     Nevada limited liability company, )
17                                     )    **DEFENDANTS' NOTICE OF MOTION**
                        Plaintiff,     )    **AND MOTION TO DISMISS**
18                                     )    **PLAINTIFF'S FIRST AMENDED**
                                       )    **COMPLAINT FOR FAILURE TO STATE**
19          v.                         )    **A CLAIM PURSUANT TO FED. R. CIV. P.**
                                       )    **12(b)(6)**
20   MEDTRONIC, INC., a Minnesota      )
     corporation; and MEDTRONIC       )
21   MONITORING, INC., a Delaware      )    Hearing Date: October 26, 2017
     corporation,                      )    Time:          2:00 pm
22                                     )    Judge:         Hon. Haywood S. Gilliam, Jr.
                        Defendants.    )    Courtroom:     2, 4th Floor
23   _____)

24   ///

25   ///

26   ///

27   ///

28

1

**TABLE OF CONTENTS**

2

NOTICE OF MOTION .................................................................................................................1

3

RELIEF SOUGHT .....................................................................................................................1

4

MEMORANDUM OF POINTS AND AUTHORITIES.............................................................1

5

   I.     INTRODUCTION ........................................................................................1

6

   II.    BACKGROUND ...........................................................................................3

7

      A.   Procedural History ..............................................................................3

8

      B.   The '789 Patent .................................................................................3

9

   III.   STATEMENT OF THE ISSUE TO BE DECIDED BY THE COURT ...........................3

10

   IV.   LEGAL STANDARDS .................................................................................4

11

      A.   The § 101 inquiry is properly raised on a motion to dismiss under Rule 12(b)(6).............4

12

      B.   Claim construction is not a prerequisite to finding that claims are directed to unpatentable subject matter where the constructions would not affect the outcome of the motion. .......5

13

      C.   The Law of 35 U.S.C. § 101 .................................................................6

14

   V.   THE COMPLAINT SHOULD BE DISMISSED BECAUSE THE ASSERTED CLAIMS ARE INELIGIBLE UNDER 35 U.S.C. § 101 ..................................................8

15

      A.   Claim construction is not necessary to decide this motion. ...............................8

16

      B.   The asserted claims of the '789 patent fail step 1 of the *Alice* test: The claims are directed to an abstract idea .................................................................................8

17

      C.   The asserted claims of the '789 patent fail step 2 of the *Alice* test: The claims fail to recite an "inventive concept" sufficient to transform it into a patent-eligible application of the idea.. ................................................................................12

18

19

20

   VI.   CONCLUSION...........................................................................................17

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Accenture Global Servs., GmbH v. Guidewire Software, Inc.*,
728 F.3d 1336 (Fed. Cir. 2013)...........................................................................14

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
134 S. Ct. 2347 (2014) ...........................................................................*passim*

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...............................................................................................4

*Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Can. (U.S.)*,
687 F.3d 1266 (Fed. Cir. 2012)..............................................................................5

*Bascom Global Internet Services, Inc. v. AT&T Mobility LLC*,
827 F.3d 1341 (Fed. Cir. 2016).............................................................................7

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................................15

*Bilski v. Kappos*,
561 U.S. 593 (2010) .........................................................................................2, 6

*In re Bilski*,
545 F.3d 943 (Fed. Cir. 2008) (*en banc*), *aff'd, Bilski v. Kappos*, 561 U.S. 593
(2010) .....................................................................................................................4

*buySAFE, Inc. v. Google, Inc.*,
765 F.3d 1350 (Fed. Cir. 2014).........................................................................8, 9

*Cloud Satchel, LLC v. Amazon.com, Inc.*,
C.A. Nos. 13-941 (SLR) (SRF), 13-942 (SLR) (SRF), 2014 WL 7227942
(D. Del. Dec. 18, 2014)..........................................................................................5

*Cogent Med., Inc. v. Elsevier Inc.*,
70 F. Supp. 3d 1058 (N.D. Cal. 2014) ..................................................................5

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*,
776 F.3d 1343 (Fed. Cir. 2014).......................................................................5, 14

*Cyberfone Sys., LLC v. CNN Interactive Grp., Inc.*,
558 F. App'x 988 (Fed. Cir. 2014).........................................................................5

*CyberSource Corp. v. Retail Decisions, Inc.,*
  654 F.3d 1366 (Fed. Cir. 2011)..................................................................................7

*Diamond v. Chakrabarty,*
  447 U.S. 303 (1980) ....................................................................................................6

*Eclipse IP LLC v. McKinley Equip. Corp.,*
  Case No. SACV 14-742-GW(AJWx), 2014 WL 4407592 (C.D. Cal. Sept. 4,
  2014) ...........................................................................................................................8

*Elec. Power Grp., LLC v. Alstom S.A.,*
  830 F.3d 1350 (Fed. Cir. 2016) ............................................................................6, 12

*Enfish, LLC v. Microsoft Corp.,*
  822 F.3d 1327 (Fed. Cir. 2016) ............................................................................7, 10

*FairWarning IP v. Iatric Sys., Inc.,*
  839 F.3d 1089 (Fed. Cir. 2016) ..................................................................................4

*Fayer v. Vaughn,*
  649 F.3d 1061 (9th Cir. 2011) ....................................................................................4

*Fitbit Inc. v. AliphCom,*
  No. 16-CV-00118-BLF, 2017 WL 819235 (N.D. Cal. Mar. 2, 2017) ........................2

*Fort Props., Inc. v. Am. Master Lease LLC,*
  671 F.3d 1317 (Fed. Cir. 2012) ..................................................................................7

*Gametek LLC v. Zynga, Inc.,*
  2014 WL 1665090 (N.D. Cal. Apr. 25, 2014) ............................................................5

*Genetic Techs. Ltd. v. Merial L.L.C.,*
  818 F.3d 1369 (Fed. Cir. 2016) ..................................................................................4

*Intellectual Ventures I LLC v. Erie Indemnity Co.,*
  850 F.3d 1315 (Fed. Cir. 2017)................................................................................14

*Intellectual Ventures I LLC v. Mfrs. & Traders Trust Co.,*
  C.A. No. 13-1274-SLR, 2014 WL 7215193 (D. Del. Dec. 18, 2014) ........................6

*Intellectual Ventures I LLC v. Symantec Corp.,*
  No. 10-1067-LPS, 2015 WL 1843528 (D. Del. Apr. 22, 2015)..................................8

*Johnson v. Fed. Home Loan Mortg. Corp.,*
  793 F. 3d 1005 (9th Cir. 2008)....................................................................................4

*Kwan v. SanMedica Int'l,*
  854 F.3d 1088 (9th Cir. 2017)....................................................................................4

*Loyalty Conversion Sys. Corp. v. Am. Airlines, Inc.*,
    66 F. Supp. 3d 829 (E.D. Tex. 2014) (Bryson, J.) .................................................................. 10

*Mayo Collaborative Servs. v. Prometheus Labs, Inc.*,
    566 U.S. 66 (2012) ................................................................................................2, 7, 12, 14

*Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.*,
    811 F.3d 1314 (Fed. Cir. 2016) ........................................................................................... 10

*Open Text S.A. v. Alfresco Software Ltd.*,
    Case No. 13-cv-04843-JD, 2014 WL 4684429 (N.D. Cal. Sept. 19, 2014) .............................. 5

*OpenTV, Inc. v. Apple, Inc.*,
    No. 14-CV-01622-HSG, 2015 WL 1535328 (N.D. Cal. Apr. 6, 2015)
    (Gilliam, J.) ......................................................................................................................... 5

*In re TLI Commc'ns LLC Patent Litig.*,
    823 F.3d 607 (Fed. Cir. 2016) .............................................................................................. 2

*Twilio, Inc. v. Telesign Corp.*,
    No. 16-CV-06925-LHK, 2017 WL 1374759 (N.D. Cal. Apr. 17, 2017) .................................. 8

*W. View Research, LLC v. Audi AG*,
    No. 2016-1947, 2017 WL 1399699 (Fed. Cir. Apr. 19, 2017) ................................................ 2

*Weisbuch v. Cty. of Los Angeles*,
    119 F.3d 778 (9th Cir. 1997) ............................................................................................... 4

**Statutes**

35 U.S.C. § 101 ......................................................................................................... *passim*

**Other Authorities**

Federal Rule of Civil Procedure 12(b)(6) .......................................................................... 1, 4, 5

**Defendants' Notice of Motion and Motion to
Dismiss Plaintiff's First Amended Complaint**
    iv
    **Case No. 4:17-cv-03664-HSG**

**NOTICE OF MOTION**

Defendants Medtronic, Inc. and Medtronic Monitoring, Inc. ("Medtronic") give notice that on October 26, 2017, at 2:00 p.m., in the Ronald V. Dellums Federal Building and United States Courthouse, Courtroom 2, 4th Floor, 1301 Clay Street, Oakland, CA 94612 before the Honorable Haywood S. Gilliam, Jr., Medtronic will and hereby does move under Federal Rule of Civil Procedure 12(b)(6) to dismiss the First Amended Complaint by Plaintiff Crandall Technologies LLC for failure to state a claim on the basis that the asserted U.S. Patent No. 8,854,789 claims ineligible subject matter under 35 U.S.C. § 101.

**RELIEF SOUGHT**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Medtronic seeks dismissal of Crandall's First Amended Complaint (Docket No. 9) for failure to state a claim upon which relief can be granted.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

This is a patent infringement action brought by patent attorney-inventor Jerry A. Crandall. In addition to his role as lead counsel for the plaintiff, Mr. Crandall is also President of Crandall Technologies LLC.  Mr. Crandall is also the patent attorney of record before the U.S. Patent and Trademark Office, as well as the sole named inventor on the asserted patent.  For clarity, plaintiff is referred to herein as "Crandall," in each of his various capacities, unless otherwise noted.

Crandall asserts infringement of U.S. Patent No. 8,854,789 ("the '789 patent").  *See* Docket No. 9-1.  The '789 patent relates to a "self-defense system."  Crandall asserts this patent against Medtronic's SEEQ Mobile Cardiac Telemetry system, a medical device regulated by the FDA.  The SEEQ product provides mobile cardiac monitoring capabilities for patients experiencing heart arrhythmia.  The SEEQ product is not intended for use as a "self-defense" device.  Moreover, a prior version of the SEEQ product, known as Nuvant, predates the asserted patent by several years (see, e.g., FDA 510(k) file K091971).

1    Although Crandall's claim suffers from multiple defects, this motion addresses one

2 particular defect in the patent, which is appropriate for resolution on the pleadings.[1]

3    The asserted claims of the '789 patent are patent-ineligible under 35 U.S.C. § 101.  The

4 claims fail to meet § 101's threshold eligibility requirement because they are directed to abstract

5 ideas and the age-old, basic human reaction of self-defense, and only purport to automate this

6 human activity using conventional communication technology and well-known, general-purpose

7 components.

8    The Supreme Court has repeatedly emphasized that abstract ideas, including mental

9 processes and basic human activities, are ineligible for patent protection under § 101.  *Alice Corp.*

10 *Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014); *Bilski v. Kappos*, 561 U.S. 593, 601-02

11 (2010).  That principle cannot be circumvented merely by limiting an idea to a particular

12 technological environment or by implementing it using generic computer components and

13 functions.  *Alice*, 134 S. Ct. at 2359-60.  In a series of recent cases, the Supreme Court, the Federal

14 Circuit, and this Court have invalidated computer-implemented patent claims under § 101.  *See*,

15 *e.g.*, *id.*; *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 614-15 (Fed. Cir. 2016); *W. View*

16 *Research, LLC v. Audi AG*, No. 2016-1947, 2017 WL 1399699, at *3 (Fed. Cir. Apr. 19, 2017)

17 (non-precedential); *Fitbit Inc. v. AliphCom*, No. 16-CV-00118-BLF, 2017 WL 819235, at *16

18 (N.D. Cal. Mar. 2, 2017).

19    Each of the asserted claims of the '789 patent (claims 1, 8, 9, 16, and 17) suffers from the

20 same basic defect as the claims in those cases because they are directed to an abstract idea that is

21 well-grounded in common human activities—the natural, physiological reaction of self-defense.

22 As such, because the asserted claims of the '789 patent recite nothing more than an abstract idea

23 carried out on generic components with conventional functionalities, the claims are directed to

24 unpatentable subject matter under 35 U.S.C. § 101, and are invalid in view of *Mayo Collaborative*

25 *Servs. v. Prometheus Labs, Inc.*, 566 U.S. 66 (2012), *Alice*, and subsequent case law.

26

27

28
---
[1] Defendants preserve all available defenses.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## II.   BACKGROUND

### A.   Procedural History

Crandall filed a Complaint for Patent Infringement on June 27, 2017, alleging infringement of the '789 patent, but failing to assert infringement of any particular claim. *See* Docket No. 1. On July 17, 2017, Crandall filed its First Amended Complaint asserting infringement of claims 1, 8, 9, 16, and 17. *See* Docket No. 9.

### B.   The '789 Patent

The '789 patent, entitled "Self-Defense System" is directed to a self-defense system that senses and reacts to pressure. *See* '789 patent.[2] According to the '789 patent, "self-defense systems and devices can play an important role in many modern scenarios that present obstacles to self-preservation," including against "attackers" and "for purposes of crime prevention and the overall protection of life and limb." *Id.* 1:14-20. In response to "an exemplary scenario" whereby "a person, such as a jogger, notices a dog running toward him in a menacing manner, as if the dog intends to attack," the '789 patent suggests that the person needs a better way to defend himself so that his vital organs are not exposed to harm when he is forced to extend his arm toward the attacking dog to discharge pepper spray or is left without enough time to aim the device if the attack happens suddenly and the device is, for example, in the user's pocket. *Id.* 4:42-67. The '789 patent's purported solution is to "make[] use of a person's **natural**, defensive posture when initiating a defense event."[3] *Id.* 5:1-3. The patent implements that concept by claiming the basic steps of a human's reaction of self-defense: sensing pressure and responding to it in defense of oneself.

## III.   STATEMENT OF THE ISSUE TO BE DECIDED BY THE COURT

Whether asserted claims 1, 8, 9, 16, and 17 of the '789 patent are patent-ineligible under 35 U.S.C. § 101 because they are directed to the abstract idea of "self-defense," and do not contain an inventive concept sufficient to render the claims patent-eligible.

---

[2] Citations herein to the "'789 patent" refer to Docket No. 9-1 in the above-captioned matter. Citations to the '789 patent are in the form of Column:Lines.
[3] Unless otherwise noted, all emphases appearing in quotations have been added.

1   **IV.**   **LEGAL STANDARDS**

2   **A.**   **The § 101 inquiry is properly raised on a motion to dismiss under Rule 12(b)(6).**

3

4   Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a complaint

5   that fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion, a

6   plaintiff "must allege enough facts to state a claim to relief that is plausible on its face." *Kwan v.*

7   *SanMedica Int'l*, 854 F.3d 1088, 1096 (9th Cir. 2017) (quoting *Turner v. City and County of San*

8   *Francisco*, 788 F.3d 1206, 1210 (9th Cir. 2015)).  "This plausibility standard requires more than 'a

9   sheer possibility that a defendant has acted unlawfully' but 'is not akin to a probability standard.'"

10  *Id.* (quoting *Turner*, 788 F.3d at 1210).  "A claim has facial plausibility when the plaintiff pleads

11  content that allows the court to draw the reasonable inference that the defendant is liable for the

12  misconduct alleged." *Id.* (quoting *Johnson v. Fed. Home Loan Mortg. Corp.*, 793 F. 3d 1005, 1007

13  (9th Cir. 2008)).  "[A] plaintiff may plead [him]self out of court" if he "plead[s] facts which

14  establish that he cannot prevail on his . . . claim." *Weisbuch v. Cty. of Los Angeles*, 119 F.3d 778,

15  783 n.1 (9th Cir. 1997).

16  In deciding a Rule 12(b)(6) motion, although factual allegations are taken as true, legal

17  conclusions are given no deference—those matters are left for the court to decide.  *See Ashcroft v.*

18  *Iqbal*, 556 U.S. 662, 678 (2009) (the tenet that allegations are taken as true on a motion to dismiss

19  "is inapplicable to legal conclusions").  The Court is not required to "assume the truth of legal

20  conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649

21  F.3d 1061, 1064 (9th Cir. 2011).

22  As courts have routinely held, whether the asserted claims of a patent are invalid as

23  unpatentable under § 101 is well-suited for resolution on a motion to dismiss.  The Federal Circuit

24  has "repeatedly recognized that in many cases it is possible and proper to determine patent

25  eligibility under 35 U.S.C. § 101 on a Rule 12(b)(6) motion." *FairWarning IP v. Iatric Sys., Inc.*,

26  839 F.3d 1089, 1097 (Fed. Cir. 2016) (quoting *Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d

27  1369, 1373-74 (Fed. Cir. 2016)).  Patentability under 35 U.S.C. § 101 is a threshold legal issue. *In*

28  *re Bilski*, 545 F.3d 943, 950-51 (Fed. Cir. 2008) (*en banc*), *aff'd*, *Bilski v. Kappos*, 561 U.S. 593

1   (2010).  This Court has previously granted motions to dismiss filed under Rule 12(b)(6) based on

2   patent ineligibility under § 101.  *See, e.g.*, *OpenTV, Inc. v. Apple, Inc.*, No. 14-CV-01622-HSG,

3   2015 WL 1535328, at *1-2 (N.D. Cal. Apr. 6, 2015) (Gilliam, J.); *Open Text S.A. v. Alfresco*

4   *Software Ltd.*, Case No. 13-cv-04843-JD, 2014 WL 4684429, *3-5 (N.D. Cal. Sept. 19, 2014).

5   Accordingly, the § 101 inquiry is properly raised on a motion to dismiss under Rule 12(b)(6).

6
7   **B.    Claim construction is not a prerequisite to finding that claims are directed to unpatentable subject matter where the constructions would not affect the outcome of the motion.**

8   "Although the determination of patent eligibility requires a full understanding of the basic

9   character of the claimed subject matter, claim construction is not an inviolable prerequisite to a

10  validity determination under § 101."  *Content Extraction & Transmission LLC v. Wells Fargo*

11  *Bank, Nat. Ass'n*, 776 F.3d 1343, 1348-49 (Fed. Cir. 2014).  In fact, "[i]n line with the Federal

12  Circuit and several other courts in this district, th[is] Court [has found] that [a 12(b)(6) motion

13  under § 101] can be resolved on the pleadings prior to formal claim construction."  *OpenTV*, 2015

14  WL 1535328, at *1-2 (citing *Content Extraction*, 776 F.3d at 1349, and finding subject matter

15  ineligible without performing formal claim construction).  Indeed, this Court and several other

16  courts have held claims directed to unpatentable subject matter on several occasions without

17  engaging in claim construction.  *See, e.g.*, *Cogent Med., Inc. v. Elsevier Inc.*, 70 F. Supp. 3d 1058,

18  1066 (N.D. Cal. 2014) (granting motion to dismiss prior to formal claim construction); *Open Text*,

19  2014 WL 4684429, at *3 (same); *Gametek LLC v. Zynga, Inc.*, 2014 WL 1665090, at *3 (N.D. Cal.

20  Apr. 25, 2014) (granting motion for judgment on the pleadings prior to formal claim construction);

21  *see also Alice*, 134 S. Ct. at 2355-60 (affirming grant of motion for judgment on the pleadings prior

22  to formal claim construction); *Content Extraction*, 776 F.3d at 1349 (affirming grant of motion to

23  dismiss prior to formal claim construction); *Cyberfone Sys., LLC v. CNN Interactive Grp., Inc.*, 558

24  F. App'x 988, 991 n.1 (Fed. Cir. 2014) (non-precedential) ("There is no requirement that the

25  district court engage in claim construction before deciding § 101 eligibility."); *Bancorp Servs.*,

26  *L.L.C. v. Sun Life Assur. Co. of Can. (U.S.)*, 687 F.3d 1266, 1273 (Fed. Cir. 2012) ("[W]e perceive

27  no flaw in the notion that claim construction is not an inviolable prerequisite to a validity

28  determination under § 101."); *Cloud Satchel, LLC v. Amazon.com, Inc.*, C.A. Nos. 13-941 (SLR)

1   (SRF), 13-942 (SLR) (SRF), 2014 WL 7227942, at *1 (D. Del. Dec. 18, 2014) (granting motion for

2   summary judgment of invalidity under § 101 without claim construction); *Intellectual Ventures I*

3   *LLC v. Mfrs. & Traders Trust Co.*, C.A. No. 13-1274-SLR, 2014 WL 7215193, at *1 (D. Del. Dec.

4   18, 2014)  (granting-in-part motion to dismiss under § 101 without claim construction).

5          **C.      The Law of 35 U.S.C. § 101**

6          Section 101 of the Patent Act sets forth four categories of patentable subject matter: "any

7   new and useful process, machine, manufacture, or composition of matter."  35 U.S.C. § 101.

8   However, the law recognizes three exceptions to patent eligibility: "laws of nature, physical

9   phenomena, and **abstract ideas**." *Diamond v. Chakrabarty*, 447 U.S. 303, 308 (1980).  Abstract

10  ideas are ineligible for patent protection because a monopoly over such ideas would preempt their

11  use in all fields.  *See Bilski*, 561 U.S. at 611-12.  In other words, "abstract intellectual concepts are

12  not patentable, as they are the basic tools of scientific and technological work."  *Id.* at 653 (quoting

13  *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972)).

14         In *Alice*, the Supreme Court established a two-step analysis to determine whether the

15  subject matter claimed by a patent was an abstract idea ineligible for protection.  134 S. Ct. at

16  2355.  The first step of the *Alice* test requires a court to determine whether the claims of a patent

17  are "directed to one of th[e] patent-ineligible concepts," such as an abstract idea.  *Id.* at 2354.  Such

18  ideas are patent-ineligible because they are basic tools in the "storehouse of knowledge" that are

19  "free to all . . . and reserved exclusively to none."  *Bilski*, 561 U.S. at 602.  If a patent's claims are

20  not directed to an ineligible concept, the inquiry is over.  *See id.*  If a court determines that a

21  patent's claims are directed toward an abstract idea, the court proceeds to *Alice* step 2 to determine

22  whether the claims contain "an element or combination of elements that is sufficient to ensure that

23  the patent in practice amounts to significantly more than a patent upon the [ineligible concept]

24  itself."  *Alice*, 134 S. Ct. at 2355 (internal quotation marks and citation omitted).  In other words,

25  the second step is a search for "an 'inventive concept' sufficient to 'transform' the claimed abstract

26  idea into a patent-eligible application."  *Id.* at 2357 (citation omitted).

27         In order to determine whether a patent claim is directed to an abstract idea, a court "look[s]

28  at the focus of the claims, their character as a whole."  *Elec. Power Grp., LLC v. Alstom S.A.*, 830

F.3d 1350, 1353 (Fed. Cir. 2016) (internal quotation marks omitted).  As the Federal Circuit has recently explained, a court at *Alice* step 1 looks to an "invention['s] basic thrust." *Bascom Global Internet Services, Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1348 (Fed. Cir. 2016).  In addition, *Alice* step 1 is devoted to the determination of whether "the focus of the claims is on [a] specific asserted improvement in computer capabilities . . . or instead, on a process that qualifies as an abstract idea for which computers are invoked merely as a tool." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335-36 (Fed. Cir. 2016).  Furthermore, "simply appending conventional steps specified at a high level of generality, to laws of nature, natural phenomena, and abstract ideas cannot make those laws, phenomena, and ideas patentable." *Mayo*, 132 S. Ct. at 1300; *see also Fort Props., Inc. v. Am. Master Lease LLC*, 671 F.3d 1317, 1323 (Fed. Cir. 2012) ("Such a broad and general limitation does not impose meaningful limits on the claim's scope." (internal quotation marks and citation omitted)).

If a court determines that a patent claim is directed to an abstract idea, *Alice* step 2 instructs that a court should "examine the elements of the claim to determine whether it contains an inventive concept sufficient to transform the claimed abstract idea in to a patent-eligible application." *Alice*, 134 S. Ct. at 2357 (internal quotation marks omitted).  The Court determines whether the claims add "significantly more" to the abstract idea—something "inventive"—that is "sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Id.* (citation omitted).  The prohibition on patenting abstract ideas cannot be circumvented through "draftsman's art" or by dressing up an abstract idea with "well-understood," "routine," or "conventional" activities—or other inconsequential features. *Id.* at 2357-59 (internal quotation marks omitted).  The Supreme Court has further instructed that identifying generic, pre-existing computer components to implement an abstract idea do not transform that idea into material that is patent-eligible. *See id.* at 2358.  These principles also apply equally to method and system claims. *Id.* at 2360.  Courts must "look to the underlying invention" for § 101 purposes. *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1374 (Fed. Cir. 2011).

**V.    THE COMPLAINT SHOULD BE DISMISSED BECAUSE THE ASSERTED CLAIMS ARE INELIGIBLE UNDER 35 U.S.C. § 101**

   **A.    Claim construction is not necessary to decide this motion.**

   The '789 patent is directed toward the age-old, abstract idea of defending oneself in response to pressure, and nothing in the asserted claims transforms this ancient abstract idea into a novel, inventive concept.  The '789 patent's claims attempt to supplement the abstract idea of "a self-defense system" merely with generic components and functions that do not render the claims patent-eligible.  Therefore, claim construction is not necessary to decide this motion, and an early determination that the subject matter of the '789 patent is ineligible under 35 U.S.C. § 101 is not only permissible, but also practical.  *See Eclipse IP LLC v. McKinley Equip. Corp.*, Case No. SACV 14-742-GW(AJWx), 2014 WL 4407592 , *6 (C.D. Cal. Sept. 4, 2014) (citing *I/P Engine, Inc. v. AOL Inc.*, 576 F. App'x 982, 996 (Fed. Cir. 2014) (Mayer, J., concurring)) ("[A]n early determination that the subject matter of asserted claims is patent ineligible can spare both litigants and courts years of needless litigation.").

   **B.    The asserted claims of the '789 patent fail step 1 of the *Alice* test: The claims are directed to an abstract idea.**

   The '789 patent claims are directed to the abstract idea of "self-defense"—sensing pressure and responding to it in defense of oneself.  In fact, the patent's specification admits that the purported invention is intended to "make[] use of a person's **natural**, defensive posture."  '789 patent at 5:1-3.

   "The United States Supreme Court has held that 'fundamental . . . practice[s] long prevalent in our system' and 'method[s] of organizing human activity' are abstract ideas."  *Twilio, Inc. v. Telesign Corp.*, No. 16-CV-06925-LHK, 2017 WL 1374759, at *14 (N.D. Cal. Apr. 17, 2017) (quoting *Alice*, 134 S. Ct. at 2356).  Additionally, the simple automation of steps that people perform indicates that a patent claims a patent-ineligible abstract concept.  *E.g.*, *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1353 (Fed. Cir. 2014) (section 101 "excludes the subject matter of certain claims that by their terms read on . . . a human-controlled series of physical acts" if directed to an abstract idea); *Intellectual Ventures I LLC v. Symantec Corp.*, No. 10-1067-LPS, 2015 WL

1 1843528, at *9 (D. Del. Apr. 22, 2015) ("Another helpful way of assessing whether the claims of

2 the patent are directed to an abstract idea is to consider if all of the steps of the claim could be

3 performed by human beings in a non-computerized 'brick and mortar' context.").

4         Here, the '789 patent attempts to claim the human reaction of self-defense.  However,

5 humans, and indeed most animals, have been defending themselves and performing the abstract

6 concept recited in the steps of the claims of the '789 patent since the beginning of time, by, *e.g.*,

7 taking in information through one's senses, processing the information, and triggering reactions.

8 Indeed, the asserted claims are directed to the way humans have physiologically reacted to pressure

9 in self-defense for ages—*e.g.*, in response to physical contact or applied pressure to one's face or

10 body, sensory organs, such as the human skin, ears, or eyes, composed of nerve cells, send

11 messages through neural transmitters to the brain, which then triggers the person to act in self-

12 defense, for example by lifting an arm or a leg.

13         With respect to asserted claim 1, for example, the human practice of self-defense in

14 response to pressure essentially comprises (1) a "material" (*e.g.*, helmet, clothing, shield, or armor)

15 sized to conform to a person's appendage (*e.g.*, head, arm, or leg), and (2) a "pressure sensor unit"

16 in the form of human skin integrated with neural transmitters that are configured to transmit signals

17 to (3) a "defense unit" in the form of the brain, which is configured to receive such signals and

18 initiate a defense event (*e.g.*, lifting of arm or leg) in response to the transmitted signals.  Just as the

19 recited wireless technology integrated in the pressure sensor unit and defense unit communicate

20 signals, so does the human nervous system integrated in the skin and the brain.  Although Crandall

21 may attempt to argue that the wireless transmission to the defense unit coupled to the material as

22 recited in claim 1 occurs outside of the person's body through conventional wireless technology as

23 opposed to through the inside of a human body as exemplified in the nervous system, even if this

24 were true, claim 1 and all asserted claims for that matter are nevertheless directed to the same

25 abstract idea of self-defense.

26         The claimed "self-defense system" is thus unpatentable at least because it is directed to a

27 "fundamental . . . practice long prevalent in our system," *Alice*, 134 S. Ct. at 2356, and "a human-

28 controlled series of physical acts," *buySAFE*, 765 F.3d at 1353, which the Federal Circuit and this

1    Court have deemed ineligible.  *See Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d

2    1314, 1324 (Fed. Cir. 2016) (finding patent claims abstract because, in part, "[t]he series of steps

3    covered by the asserted claims . . . could all be performed by humans without a computer"); *see*

4    *also, e.g.*, *Loyalty Conversion Sys. Corp. v. Am. Airlines, Inc.*, 66 F. Supp. 3d 829, 842 (E.D. Tex.

5    2014) (Bryson, J. of the Federal Circuit sitting by designation).   In other words, far from the type

6    of "specific asserted improvement in computer capabilities," which might confer patent eligibility,

7    claim 1 recites the basic human activity and age-old idea of self-defense and, at most, invokes

8    computing technology "merely as a tool" to perform an abstract idea.  *Enfish*, 822 F.3d at 1335-36.

9         Each of the other asserted claims of the '789 patent is similarly abstract.  Claim 8, which

10   depends on claim 1, and independent claim 17 attempt to cover the same abstract idea as claim 1,

11   reciting an additional component of "a manual selector" based on the same abstract idea of the

12   human physiological reaction to self-defense.  Using the same human nervous system example

13   provided above, this "manual selector" component essentially claims a person's ability to use

14   his/her brain to initiate a "defense event" (*e.g.*, controlling movement in one's arms or legs) even

15   without responding to pressure.  Just as in claim 1, the "signal" generated by the manual selector

16   corresponds to the chemical signals generated by the person's neural transmitters in response to his

17   or her decision to defend oneself.  Therefore, claims 8 and 17 are also directed to the basic human

18   activity and abstract idea of self-defense.

19        Asserted claim 9 depends on claim 1 and is also directed to the same abstract idea.  Claim 9

20   further recites components and steps for "a conductive energy device comprising two

21   electrodes, . . . configured to generate a voltage differential between said electrodes based on said

22   pressure input signal."  This claimed "conductive energy device" is directed to a generic stun gun,

23   which has been used by humans in self-defense long before the '789 patent was filed.  Tellingly,

24   the '789 patent's specification itself admits that it is directed toward generic "stun guns."  *See* '789

25   patent 7:15-16 ("types of self-defense units, such as conductive energy devices (e.g., stun guns)"),

26   7:64-8:6 ("conductive energy device . . . configured to generate a voltage differential [that] is high

27   enough to disable an attacker with an electric shock or current. . . . such that an attacker is

28   momentarily stunned or disabled when coming into contact with electrodes").

1    Asserted claim 16 also depends on claim 1 and is directed to the same abstract idea.

2  Asserted claim 16 further recites components and steps for "an audio output unit communicatively

3  associated with said pressure sensor unit, . . . configured to access preselected audio data based on

4  said pressure input signal, . . . and further configured to generate and output and [*sic*] audio signal

5  based on or associated with said preselected audio data."  In other words, claim 16 is directed to the

6  basic human activity of a person calling out or yelling words or sounds ("generate and [*sic*]

7  output") typically called or yelled out in response to being attack ("based on or associated with said

8  preselected audio data"), like the word "help" or "stop."  Using the same nervous system example

9  provided above, this "audio output unit" exists in humans in the form of speech organs, such as the

10  lips, teeth, and vocal cords or folds in the larynx, or voice box, which are "communicatively

11  associated" with "said pressure sensor unit" (*e.g.*, one's skin via the human nervous system).  As

12  the '789 patent admits, the "preselected audio data" may be "utter[ed] terms such as 'stop' or

13  'help' [by a person] in response to being attacked" and/or "other sounds [by a person] associated

14  with threatening behavior [that] may be indicative of an attack."  '789 patent 14:7-11.  Claim 16 is

15  thus also directed to the age-old and instinctual human reaction to yell "stop" or call out for help in

16  response to an attack.

17    To the extent Crandall argues that it also asserted claims 2-7 and 10-15 (it did not—see

18  Docket No. 9), these claims are similarly directed to the same abstract concept of self-defense that

19  existed for years before the '789 patent was filed.  For example, claims 2 and 5 are dependent on

20  claim 1 and are also directed to the basic concept of comparing pressure inputs from multiple

21  points and initiating a defense event based on the comparison—*e.g.*, feeling more pressure on one

22  part of the body than another and defensively turning toward the side with less pressure.  Claims 3

23  and 10 are dependent on claims 2 and 1, respectively, and are also directed to self-defense

24  products, such as a stun gun or pepper spray.  Claim 4 is dependent on claim 1 and is also directed

25  to "armor" and the protective gear humans use to defend themselves.  Claim 6 is dependent on

26  claim 1 and is also directed to a heart rate monitor, such as the body's ability to initiate a defense

27  event based on its physiological response to a higher heart rate (*e.g.*, the fight-or-flight response)

28  coupled with a response to a pressure input.  Claims 7 and 12 are dependent on claim 1 and are also

1  directed to responding to audio and pressure inputs, such as a human's innate ability to react in

2  self-defense when he or she hears the words "watch out" in addition to feeling pressure from

3  something striking his or her skin.  Claim 13 is dependent on claim 1 and is also directed to a

4  person's use of his or her sight to see and defend himself or herself from attack.  Claim 14 is

5  dependent on claim 1 and directed to capturing video input data in response to a pressure input,

6  such as a human looking to see what hit him or her or using a camera to record an attacker.

7  Finally, claim 15 is dependent on claim 1 and directed to a geolocation unit that responds to

8  pressure, such as a human's ability to think about where he or she is or to use a GPS tracking

9  device when being attacked.

10         In summary, the "focus" of all of the claims and "their character as a whole" are directed to

11  the well-known, fundamental human activity of self-defense, an abstract idea ineligible for patent

12  protection.  *Elec. Power*, 830 F.3d at 135.

13         The '789 patent claims, therefore, fail the first step of the *Alice* test.

14     **C.     The asserted claims of the '789 patent fail step 2 of the *Alice* test: The claims
              fail to recite an "inventive concept" sufficient to transform it into a patent-**

15            **eligible application of the idea.**

16         Because the claims of the '789 patent attempt to cover the abstract idea of self-defense, any

17  "additional features" they recite must be analyzed to determine whether they add an "inventive

18  concept" that is "significantly more" than the claimed ideas, and thus "'transform' the claimed

19  abstract idea into a patent-eligible application."  *Alice*, 134 S. Ct. at 2355, 2357.  In examining

20  whether a claim is sufficiently transformative, the Supreme Court describes "a search for an

21  'inventive concept'—*i.e.*, an element or combination of elements that is 'sufficient to ensure that

22  the patent in practice amounts to significantly more than a patent upon the [ineligible concept]

23  itself.'"  *Id.* at 2355 (citation omitted).  Abstract ideas are not rendered patentable solely by adding

24  "well-understood, routine, conventional activity," which is not considered to be an "inventive

25  concept."  *Mayo*, 132 S. Ct. at 1294, 1298, 1299.  The Supreme Court again reiterated these

26  requirements in *Alice* by explicitly holding that the "inventive concept" requires more than simply

27  stating that the process needs to be done on a generic computer using well-understood, routine,

28  conventional activity.  134 S. Ct. at 2359-60.

1    The elements of asserted claims 1, 8, and 17 essentially recite a self-defense system

2  comprising the following: [A] a material sized to conform to an appendage; [B] a pressure sensor

3  unit integrated with a wireless transmitter, and configured to generate a pressure input signal; [C] a

4  defense unit coupled with said material, integrated with a wireless receiver configured to wirelessly

5  receive the pressure input signal from the wireless transmitter, and configured to initiate a defense

6  event based on said pressure input signal; and [D] a manual selector communicatively associated

7  with said defense unit and configured to generate a manual execution signal in response to a

8  selection of said manual selector, wherein the defense unit is configured to initiate the defense

9  event based on the manual execution signal.  These elements do not add any "inventive concept"

10  that provides "significantly more" than the abstract idea of self-defense in response to pressure for

11  several reasons.

12    *First*, the elements of the claims recite nothing more than generic components that are used

13  in conventional ways as shown by the '789 patent's very own description in the specification.  The

14  "material sized to conform to an appendage" recited in element [A] is described as including "a

15  piece of [physical] material," such as of leather, cloth, rubber and neoprene worn, and/or other

16  materials that can conform to a person's appendage.  *See, e.g.,* '789 patent 5:5-6, 5:58-64, 7:43-49.

17  The "pressure sensor unit" recited in element [B] is described as including a unit or device that

18  "sense[s] an applied [or physical] pressure."  *See, e.g., id.* 12:13-14, 24-26, 13:55-56, 15:23-25.

19  The "defense unit" of element [C] is described as including a unit that is generally "configured to

20  initiate a defense event."  *See, e.g., id.* 1:64-67, 6:10-14, 11:21-23, 12:21-22, 13:16-18.  The

21  "manual selector" of element [D] is described as including a "selection mechanism" that "manually

22  initiate[s] a defense event."  *See, e.g., id.* 15:20-22, 21:60-22:2.  Even if Crandall argues that any of

23  these limitations is somehow limited to a computing component, it is still just that—a generic

24  computing component.

25    *Second*, to the extent Crandall argues that the claims are somehow directed to automating

26  the human activity of self-defense, the recitation of conventional communication technology and

27  well-known, general-purpose computing components for their intended purpose is insufficient to

28  transform the abstract concepts into patent-eligible subject matter.  For example, elements [B], [C],

1   and [D] recite "well-understood, routine, conventional activit[ies]" that may be practiced using

2   generic computers and generic communications hardware and do not add any inventive concept.

3   *Mayo*, 132 S. Ct. at 1294, 1298, 1299; *Alice*, 134 S. Ct. at 2358 ("mere recitation of a generic

4   computer" is insufficient).  Element [B] essentially recites a unit able to generate a signal

5   ("pressure input signal") and configured to transmit the signal to a secondary unit claimed in

6   element [C], which is configured to receive a signal from primary units claimed in element [B] and

7   [D] ("configured to initiate a defense event based on said pressure input signal" or "in response

8   to . . . said manual execution signal[]") and able to respond to such signal ("initiate a defense

9   event").  Collecting, transmitting, and receiving signals are indubitably routine and conventional

10  activities, particularly for computers, and thus do not add an inventive concept.  *See Alice*, 134 S.

11  Ct. at 2360 (finding a "data processing system" and "data storage unit" to be "purely functional and

12  generic"); *Content Extraction*, 776 F.3d at 1348 (finding that the asserted patents contain "no

13  limitations . . . that transform the claims into a patent-eligible application" despite various

14  "memory" elements in the claims).

15          To the extent Crandall argues that independent claims 1 and 17 are directed to well-known

16  computer technology, including "a wireless transmitter" and a "wireless receiver configured to

17  wirelessly receive . . . signal from said wireless transmitter," the recitation of generic components

18  and communications hardware is insufficient to transform an abstract concept into a patent-eligible

19  application.  *See Accenture Global Servs., GmbH v. Guidewire Software, Inc.,* 728 F.3d 1336, 1345

20  (Fed. Cir. 2013) (holding that "Accenture's attempts to limit the abstract concept to a computer

21  implementation . . . do not provide additional substantive limitations to avoid preempting the

22  abstract idea of system claim 1" despite claim  limitations reciting "an insurance transaction

23  database," "client component," "server component," and "event processor");  *Intellectual Ventures*

24  *I LLC v. Erie Indemnity Co.*, 850 F.3d 1315, 1328-29 (Fed. Cir. 2017) (finding that sending and

25  receiving information using computers is routine and generic).

26          *Third*, the "pressure input signal" is communicated from the pressure sensor unit's wireless

27  transmitter to the defense unit's wireless receiver in a generic, routine, and conventional manner.

28  In fact, the specification makes clear that the claims are not even limited to a particular technology.

1   The '789 patent asserts that "**various wireless communication methods may be implemented**,

2   such as by short wavelength radio transmissions (e.g., Bluetooth[TM] transmissions) or across cellular

3   networks, and that the present technology is **not limited to any particular wireless**

4   **communication methodology**."  '789 patent 23:4-9.  Thus, even if Crandall argues that the claims

5   are somehow limited to generic computing systems, the '789 patent specification admits that the

6   system may be "**any type of computing device**" and does not disclose, let alone claim, any "novel

7   or unusual" improvement to "the functioning of the computer itself" or any "advance in computer

8   technology that makes the performance of [routine] functions more effective."  *Alice*, 134 S. Ct. at

9   2358-60; *see* '789 patent 23:10-21 ("Computer system 3700 may be any type of computing device

10  (e.g., a computing device utilized to perform calculations, processes, operations, and functions

11  associated with a program or algorithm).").  These admissions confirm that there is nothing

12  inventive about the wireless technology component or purported automation of the abstract idea.

13  Rather, this limitation would only place the claimed idea in known "technological environment[s],"

14  and would not provide any meaningful limitation beyond that idea.  *Alice*, 134 S. Ct. at 2358.

15       The abstract nature of the claims is further illustrated by Crandall's misplaced and flawed

16  attempts to assert the claims against the Medtronic SEEQ device in this case.  *Bell Atl. Corp. v.*

17  *Twombly*, 550 U.S. 544, 572 (2007) ("[A] judge ruling on a defendant's motion to dismiss a

18  complaint must accept as true all of the factual allegations contained in the complaint.").  The

19  SEEQ product is alleged to satisfy the "self-defense" claim limitations, because it "functions to

20  protect the user or the user's interests."  Docket No. 9 at ¶ 60.  Moreover, the specific elements of

21  the SEEQ product identified in the complaint as allegedly infringing amount to nothing more than

22  a collection of "well-understood, routine, conventional" components.  *See, e.g.*, Docket No. 9 at ¶¶

23  67, 68, 70 (accusing "Black Material," "Transmitter Case," "Wearable Sensor," "Patient Trigger

24  Button").

25       Therefore, asserted claims 1, 8 and 17 of the '789 patent are directed merely to an age-old

26  abstract idea to address an age-old problem, and the claims fail to recite any limitations sufficient

27  to transform the ineligible subject matter.

28

Asserted dependent claims 9 and 16 of the '789 patent also recite additional limitations that suffer from some of the same eligibility shortcomings as independent claim 1 on which claims 9 and 16 depend. When the abstract idea of self-defense is teased out of claims 9 and 16, as with asserted claims 1, 8, and 17, nothing inventive remains that would justify the claims' scope of preemption. These dependent claims recite nothing more than generic components that are used in conventional ways, thereby failing to add any "inventive concept" that provides "significantly more" than the abstract idea of self-defense as required by *Alice*. With respect to dependent claim 9, the "conductive energy device" recited is simply a device, such as a generic "stun gun," that is able "to generate a voltage differential between . . . electrodes." '789 patent 11:28-30, 16:3-7, 26:35-39. The "audio output unit" recited in claim 16 is exactly that—a unit or device that is "configured to generate and output an audio signal," such as a generic audio speaker. *Id.* 18:67-19:3. As with the asserted independent claims, Crandall also does not assert that it invented any of these components, nor does the specification describe them as inventive. In fact, the '789 patent admits as much by providing well-known, pre-existing real-world examples of such components. *See, e.g.*, '789 patent 7:15-16 ("types of self-defense units, such as conductive energy devices (e.g., stun guns)"), 18:63-19:3 ("an audio output unit 3220 (e.g., an audio speaker) . . . . also configured to generate and output an audio signal 3230 (e.g., an emergency siren)"). Again, the assertion of these claims against the Medtronic SEEQ product illustrates the point. The accused functionality identified in the first amended complaint is simply "circuitry," an "Audio Speaker," and a "Beep." Docket No. 9 at ¶¶ 86, 90.

To the extent Crandall wrongly argues that it also asserted claims 2-7 and 10-15 (it did not), these claims are similarly directed to the same abstract concept of self-defense and fail to add an "inventive concept" sufficient to transform the claims into a patent-eligible subject matter as required by *Alice*. 134 S. Ct. at 2355, 2357. As with the asserted dependent claims 9 and 16, unasserted claims 2-7 and 10-15 also recite nothing more than generic components that are used in conventional ways. *See, e.g.*, '789 patent claims 2 and 5 ("comparator" for comparing signals and outputting a result), claims 3 and 10 ("projector units" for projecting a substance and "conductive energy devices" for conducting and generating energy—*e.g.*, pepper spray or a stun gun), claim 4

1  ("armor units" for armor and other such protective gear), claim 6 ("cardio unit" for cardiac

2  monitoring and "signal generator" for generating an signal), claims 7 and 12 ("audio input unit" for

3  sensing and capturing audio), claim 11 ("container" for containing a substance and "force

4  applicator" for applying force), claim 13 ("image input unit" for sensing and capturing images),

5  claim 14 ("video input unit" for sensing and capturing video), and claim 15 ("geolocation unit" for

6  sensing geolocation information).

7         Thus, the dependent claims do not recite an inventive concept sufficient to transform the

8  abstract idea of self-defense into a patent-eligible application of the idea.  For these reasons, the

9  dependent claims of the '789 patent are patent-ineligible just like the independent claims.

10        The '789 patent claims, therefore, fail the second step of the *Alice* test.

11  **VI.   CONCLUSION**

12        For the foregoing reasons, Medtronic respectfully requests that the Court dismiss Crandall's

13  First Amended Complaint on the ground that the claims of the '789 patent are invalid for failure to

14  claim patent-eligible subject matter under 35 U.S.C. § 101.  Medtronic further respectfully requests

15  a hearing and oral argument on this motion.

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3  Date: August 30, 2017

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully Submitted,


By: __/s/ *James L. Davis, Jr.*
James L. Davis, Jr. (CSB # 304830)
james.l.davis@ropesgray.com
ROPES & GRAY LLP
1900 University Avenue, 6th Floor
East Palo Alto, California 94303-2284
Telephone: (650) 617-4000
Facsimile: (650) 617-4090

Richard T. McCaulley, Jr. (*pro hac vice*)
richard.mccaulley@ropesgray.com
ROPES & GRAY LLP
191 North Wacker Drive, 32nd Floor
Chicago, IL 60606
Telephone:  (312) 845-1200
Facsimile:  (312) 845-5500

*Attorneys for Defendants*
*MEDTRONIC, INC. and*
*MEDTRONIC MONITORING, INC.*

1

## CERTIFICATE OF SERVICE

2          The undersigned certifies that on August 30, 2017, the foregoing Defendants' Notice Of

3     Motion And Motion To Dismiss Plaintiff's First Amended Complaint For Failure To State A

4     Claim Pursuant To Fed. R. Civ. P. 12(b)(6) and all supporting documents were filed and served

5     on all counsel of record electronically using the CM/ECF system in compliance with Civil Local

6     Rule 5-1.

7

8

9                                              *James L. Davis Jr.*
                                               James L. Davis, Jr.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28