Jerry A. Crandall (CSB No. 250192)
jac@crandalltech.com
CRANDALL TECHNOLOGIES LLC
1590 Heavenly View Trail
Reno, NV 89523
Telephone:     775.525.8777
Facsimile:     775.501.5157

*Attorney for Plaintiff*
*CRANDALL TECHNOLOGIES LLC*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| CRANDALL TECHNOLOGIES LLC, a Nevada limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>MEDTRONIC, INC., a Minnesota corporation; and MEDTRONIC MONITORING, INC., a Delaware corporation,<br><br>Defendants. | Case No. 4:17-cv-03664-HSG<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Hearing Date:     October 26, 2017<br>Time:     2:00 p.m.<br>Judge:     Hon. Haywood S. Gilliam, Jr.<br>Courtroom:     2, 4th Floor |

///
///
///
///
///
///
///
///
///

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ………………………………………….…………………ii

MEMORANDUM OF POINTS AND AUTHORITIES ……………….…………….....1

I. INTRODUCTION ……………………………………………………………… 1

II. BACKGROUND …………………………………………………….…………... 2

    A. Procedural History …………………………………………………………. 2

    B. The '789 Patent ……………………………………………………………. 2

III. STATEMENT OF THE ISSUES TO BE DECIDED BY THE COURT ……….…….3

IV. LEGAL STANDARDS ……………………………………………………… 4

    A. The § 101 inquiry is improperly raised under Rule 12(b)(6) where the parties have not yet filed their claim constructions or fully briefed the Court as to disputes over the proper constructions of the asserted claims ……………………...................... 4

    B. Fed. R. Evid. 201(b) enables a court to consider certain materials outside of the complaint when ruling on a Rule 12(b)(6) motion …………………………….…. 6

    C. The law of 35 U.S.C. § 101 ……………………………………………………. 6

V. THE MOTION TO DISMISS SHOULD BE DENIED BECAUSE THE INQUIRY UNDER § 101 IS PROCEDURALLY IMPROPER …………….………………… 8

VI. THE MOTION TO DISMISS SHOULD BE DENIED BECAUSE THE DEFENDANTS ATTEMPTED TO WITHHOLD RELEVANT INFORMATION FROM THIS COURT ……………………………………………………………………… 10

VII. THE MOTION SHOULD BE DISMISSED BECAUSE THE ASSERTED CLAIMS ARE ELIBIBLE UNDER § 101 …………………….…………………............... 12

    A. The Court should apply a "clear and convincing" evidence standard when determining validity of the '789 patent ……………………………………………13

    B. The asserted claims of the '789 patent pass step 1 of the *Alice* test: The claims are not directed to an abstract idea ………………………………………………13

    C. The asserted claims of the '789 patent pass step 2 of the *Alice* test: The claims recite an inventive concept sufficient to transform each of the claims into a patent-eligible application of the idea …………………………………………………….20

VIII. CONCLUSION ………………………………………………………... 28

# TABLE OF AUTHORITIES

**Cases**                                                             **Page(s)**

*Accenture Global Servs., GmbH v. Guidewire Software, Inc.*,
    728 F.3d 1336 (Fed. Cir. 2013) …………………………………………3, 4

*Adams v. Johnson*,
    355 F.3d 1179 (9th Cir. 2004) ………………………………………… 3

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
    134 S. Ct. 2347 (2014) …………………………………………… *passim*

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) …………………………………………………..3

*Bancorp Services, L.L.C. v. Sun Life Assurance Co. of Canada (U.S.)*,
    687 F.3d 1266 (Fed. Cir. 2012) ………………………………………1, 4, 7

*Bascom Global Internet Servs., Inc. v. AT & T Mobility LLC*,
    827 F.3d 1341 (Fed. Cir. 2016) ………………………………………13

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) …………………………………………………..3

*Bilski v. Kappos*,
    561 U.S. 593 (2010) …………………………………………………..5

*buySAFE, Inc. v. Google Inc.*,
    765 F.3d 1350 (Fed. Cir. 2014) ………………………………………11

*Daniels-Hall v. Nat'l Ed. Ass'n*,
    629 F.3d 992 (9th Cir. 2010) ……………………………………….5, 8

*Diamond v. Diehr*,
    450 U.S. 175 (1981) ………………………………………………6, 14

*Enfish, LLC v. Microsoft Corp.*,
    822 F.3d 1327 (Fed. Cir. 2016) ……………………………………12, 13

*Gottschalk v. Benson*,
    409 U.S. 63 (1972) …………………………………………………..6

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,

    519 F.3d 1025 (9th Cir. 2008) …………………………………...……………………3

*Mayo Collaborative Servs. v. Promethus Labs, Inc.*,

    132 S. Ct. 1289 (2012) ……...…………………………………...…2, 5, 6, 13, 15

*Open Text S.A. v. Alfresco Software Ltd.*,

    Case No. 13-cv-04843-JD, 2014 WL 4684429 (N.D. Cal. Sept. 19, 2014) ………4, 6, 7, 10

*OpenTV, Inc. v. Apple, Inc.*,

    Case No. 14-cv-01622-HSG, 2015 WL 1535328 (N.D. Cal. Apr. 6, 2015)

    (Gilliam, J.) …………………………………………………………… *passim*

*Parker v. Flook*,

    437 U.S. 584 (1978) ……...……………………………………………...14

*SkillSurvey, Inc. v. Checkster LLC*,

    178 F.Supp.3d 247 (E.D. Pa. 2016) …………………………….……..4, 10

*SkillSurvey, Inc. v. Checkster LLC*,

    No. 16-1994 (Fed. Cir. 2017) ……………………….…………………...4, 10

*Swartz v. KPMG LLP*,

    476 F.3d 756 (9th Cir. 2007) ……...…………………………………5

*X One, Inc. v. Uber Technologies, Inc.*,

    239 F.Supp.3d 1174 (N.D. Cal. 2017) ………………………………13

**Statutes**

35 U.S.C. § 101 ………………………………………..…………*passim*

35 U.S.C. § 271(a)-(c) …………………………………………1

35 U.S.C. § 282(a) ……………………………………...…….3, 4, 10

**Other Authorities**

Fed. R. Civ. P. 12(b)(6) ………………………………………….... *passim*

Fed. R. Evid. 201(b) ……………………………………...…5, 8

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   <u>INTRODUCTION</u>

This is a patent infringement action brought by Plaintiff Crandall Technologies LLC (hereinafter "Plaintiff") against Defendant Medtronic, Inc. and Defendant Medtronic Monitoring, Inc. (hereinafter "the Defendants") alleging that the Defendants have infringed United States Letters Patent No. 8,854,789 B2 ("the '789 patent").  Plaintiff has filed its First Amended Complaint in this action, wherein Plaintiff has presented theories of infringement liability under 35 U.S.C. § 271(a)-(c) in view of (i) Defendants' Medtronic SEEQ™ MCT System (hereinafter "the SEEQ MCT System") and (ii) various actions taken by the Defendants in association with the SEEQ MCT System.  The Defendants responded by filing a Motion to Dismiss Plaintiff's First Amended Complaint under Fed. R. Civ. P. 12(b)(6), wherein the Defendants argue (i) that the '789 patent is invalid under 35 U.S.C. § 101 as being directed to unpatentable subject matter and (ii) that a § 101 inquiry has been properly raised on this motion to dismiss under Rule 12(b)(6).  The Defendants arguments are flawed for a number of reasons.

*First*, the Federal Circuit requires a court, prior to making a determination of patent eligibility under § 101, to have acquired "a full understanding of the basic character of the claimed subject matter", and, to this end, it has warned that "it will ordinarily be desirable—and often necessary—to resolve claim construction disputes **prior** to a § 101 analysis".[1]  *Bancorp Services, L.L.C. v. Sun Life Assurance Co. of Canada (U.S.)*, 687 F.3d 1266, 1273-1274 (Fed. Cir. 2012).  Claim construction disputes have not yet been resolved in this action, as demonstrated herein.

*Second*, the Defendants § 101 analysis is fundamentally flawed, as demonstrated herein.  In particular, the '789 patent is not directed to a patent-ineligible concept at least because the entire field of "self-defense" is not a protected abstract idea.  Additionally, to the extent that the Defendants attempt to narrow this abstract idea to a human's natural, physiological reaction of self-defense, the elements of each claim of the '789 patent, when considered "both individually

---

[1] Unless otherwise noted, all emphases appearing in quotations have been added.

1    and 'as an ordered combination' " are nevertheless sufficient to "'transform the nature of the

2    claim' into a patent-eligible application" (*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct.

3    2347, 2355 (2014), citing *Mayo Collaborative Servs. v. Prometheus Labs, Inc.*, 132 S. Ct. 1289,

4    1298, 1297 (2012)), as is explained in significant detail herein.

5    **II.    BACKGROUND**

6        **A.    Procedural History**

7          Plaintiff filed an initial Complaint for Patent Infringement on June 27, 2017, alleging

8    infringement of the '789 patent.  *See* Docket No. 1.  Plaintiff filed a First Amended Complaint on

9    July 17, 2017, wherein Plaintiff plead infringement of claims 1, 8, 9, 16 and 17 of the '789 patent

10   and identified the SEEQ MCT System, and conduct associated therewith, as an accused

11   instrumentality.  *See* Docket No. 9.

12         The Defendants filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6) on August 30,

13   2017.  *See* Docket No. 27.  The Defendants have not filed an Answer to the First Amended

14   Complaint.  The parties have not filed their Joint Claim Construction and Prehearing Statement.

15   The parties have not filed their Claim Construction Briefs.

16       **B.    The '789 Patent**

17         The '789 patent[2] has 17 different claims, wherein each of these claims is directed to a

18   "self-defense system".  *Id.* 25:30-39; 28:8-20.  The '789 patent purports to be concerned with

19   "physical damage to one's life and limb", and explicitly states that "self-defense systems and

20   devices can play an important role in **many** modern scenarios that present obstacles to **self-**

21   **preservation**", and that "many of these systems and devices may be implemented" by "civilian

22   populations for … the **overall protection of life and limb**."  *Id.* 1:13-20.  Moreover, although

23   various example implementations have been provided within the '789 patent, the issued claims

24   of the '789 patent are not necessarily limited to those example implementations.  *See id.* at

25   25:22-28.

26   _____

27   [2] Citations herein to the "'789 patent" refer to Docket No. 9-3 in the above-captioned matter.

28   Citations to the '789 patent are in the form of Column:Lines.

## III.   STATEMENT OF THE ISSUES TO BE DECIDED BY THE COURT

The issues to be decided by this court include (i) whether the inquiry under 35 U.S.C. § 101 has been improperly raised in the subject motion to dismiss under Rule 12(b)(6), (ii) whether the Defendants acted improperly by withholding information from the Court that indicates a current dispute over the proper constructions of the asserted claims, (iii) whether the Court should apply a "clear and convincing" evidence standard to a challenge to patent validity under § 101 at the motion to dismiss stage, and (iv) Whether the asserted claims of the '789 patent are directed to patent-eligible subject matter under § 101.

## IV.   LEGAL STANDARDS

### A.   The § 101 inquiry is improperly raised under Rule 12(b)(6) where the parties have not yet filed their claim constructions or fully briefed the Court as to disputes over the proper constructions of the asserted claims

Pursuant to Fed. R. Civ. P. 12(b)(6), a defendant may move to dismiss an action for failure to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "The [facial] plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted). For purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). However, "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004); accord *Ashcroft,* 556 U.S. at 678. Furthermore, "a plaintiff may plead [him]self out of court" if he "plead[s] facts which establish that he cannot prevail on his ... claim."

Under 35 U.S.C. § 282(a), "a patent shall be presumed valid." Indeed, the validity of each patent claim "shall be presumed valid independently of the validity of other claims", even where a claim is dependent upon an invalid claim, and the burden of proof for establishing invalidity rests on the party asserting such invalidity. *Id.* A claim of invalidity under 35 U.S.C. § 101 presents a question of law. *Accenture Global Servs., GmbH v. Guidewire Software, Inc.,*

728 F.3d 1336, 1340-41 (Fed. Cir. 2013). However, in view of the statute-mandated presumption of patent validity under § 282(a), a split of authority has developed regarding whether to apply a "clear and convincing" evidence standard as to subject matter eligibility at the motion to dismiss stage. *See, e.g., SkillSurvey, Inc. v. Checkster LLC*, 178 F.Supp.3d 247, 254-255 (E.D. Pa. 2016), *aff'd, SkillSurvey, Inc. v. Checkster LLC*, No. 16-1994 (Fed. Cir. 2017).

This Court has previously granted (in certain instances) motions to dismiss filed under Rule 12(b)(6) based on patent ineligibility under § 101. *See, e.g., OpenTV, Inc. v. Apple, Inc.*, Case No. 14-cv-01622-HSG, 2015 WL 1535328 (N.D. Cal. Apr. 6, 2015) (Gilliam, J.); *Open Text S.A. v. Alfresco Software Ltd.*, Case No. 13-cv-04843-JD, 2014 WL 4684429 (N.D. Cal. Sept. 19, 2014). However, a § 101 inquiry is not properly raised on a motion to dismiss under Rule 12(b)(6) in all instances. In *Bancorp*, when indicating that it "perceive[s] no flaw in the notion that claim construction is not an inviolable prerequisite to a validity determination under § 101", the Federal Circuit expressly warned that "it will ordinarily be desirable—and often necessary—to resolve claim construction disputes **prior** to a § 101 analysis, for the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter." *Id.*, 687 F.3d at 1273-1274.

Although this Court has previously granted motions to dismiss filed under Rule 12(b)(6) based on patent ineligibility under § 101, it has done so, for example, **after the parties have filed their claim constructions** with the Court **and:**

1) the Court has determined that **there are no disputes** over the proper constructions of the asserted claims (*see, e.g., Open Text*, 2014 WL 4684429 at *3); or

2) the parties have **fully briefed the Court as to any disputes** over the proper constructions of the asserted claims (*see, e.g., OpenTV*, 2015 WL 1535328 at *3).

Thus, this Court has indicated that the identification of disputes over the proper constructions of the asserted claims is an important step in determining whether to engage in claim construction before addressing validity under § 101.

**B.** **Fed. R. Evid. 201(b) enables a court to consider certain materials outside of the complaint when ruling on a Rule 12(b)(6) motion**

"In ruling on a 12(b)(6) motion, a court may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007). Under the doctrine of judicial notice, courts are permitted to establish and rely on "a fact that is not subject to reasonable dispute because it … can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). This includes information governmental entities have made publicly available on websites, unless the authenticity or accuracy of the websites or information displayed is disputed. *Daniels-Hall v. Nat'l Ed. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).

**C.** **The law of 35 U.S.C. § 101**

35 U.S.C. § 101 defines the subject matter eligible for patent protection. It provides:

> Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

*Id.* It is well settled that "this provision contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice*, 134 S. Ct. at 2354 (citation omitted). The U.S. Supreme Court has "described the concern that drives this exclusionary principle as one of **pre-emption**." *Alice*, 134 S. Ct. at 2354, citing *Bilski v. Kappos*, 561 U.S. 593, 611-612 (2010) ("upholding the patent 'would pre-empt use of this approach **in all fields**, and would effectively grant a monopoly over an abstract idea'").

The U.S. Supreme Court has provided a two-part test that courts must utilize to determine whether a claim's includes patent-eligible subject matter. First, a court must "determine whether the claims at issue are directed to one of those patent-ineligible concepts." *Alice*, 134 S. Ct. at 2355. If they are, the Court must then "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id.*, citing *Mayo*, 132 S. Ct. at 1298, 1297.

1   Claim features sufficient to cause a patent claim to amount to "significantly more" than

2   the ineligible concept itself include those that add a specific limitation other than what is well-

3   understood, routine and conventional in the field, or adding unconventional steps that confine the

4   claim to a particular useful application.  *See Mayo*, 132 S. Ct. at 1299, 1302.  Indeed, "[a]t some

5   level, 'all inventions ... embody, use, reflect, rest upon, or apply laws of nature, natural

6   phenomena, or abstract ideas.' " *Alice*, 134 S. Ct. at 2354, citing *Mayo*, 132 S. Ct. at 1293.

7   "Thus, an invention is not rendered ineligible for patent simply because it involves an abstract

8   concept."  *Alice*, 134 S. Ct. at 2354, citing *Diamond v. Diehr*, 450 U.S. 175, 187 (1981).

9   "'[A]pplication[s]' of such concepts 'to a new and useful end,' we have said, remain eligible for

10  patent protection." *Alice*, 134 S. Ct. at 2354, citing *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972).

11  Thus, when engaging in a § 101 inquiry, courts must "distinguish between patents that claim the

12  'buildin[g] block[s]' of human ingenuity and those that integrate the building blocks into

13  something more, … thereby 'transform[ing]' them into a patent-eligible invention".  *Alice*, 134

14  S. Ct. at 2354, citing *Mayo*, 132 S. Ct. at 1303, 1294.  Indeed, the U.S. Supreme Court has

15  explained that "[t]he latter pose no comparable risk of pre-emption, and therefore remain eligible

16  for the monopoly granted under our patent laws."  *Alice*, 134 S. Ct. at 2355.

17  **V.   THE MOTION TO DISMISS SHOULD BE DENIED BECAUSE THE INQUIRY
       UNDER § 101 IS PROCEDURALLY IMPROPER**

18

19  The Defendants cite to *Open Text* and *OpenTV* to illustrate that this Court has previously

20  granted motions to dismiss filed under Rule 12(b)(6) based on patent ineligibility under § 101,

21  and has specifically done so prior to formal claim construction.  Docket 27, page 5, lines 1-5.

22  However, the Defendants fail to point out that, in *Open Text*, this Court did not grant the motion

23  to dismiss until **after the parties had filed their Joint Claim Construction Statement** and after

24  the Court was able to thereby definitively determine that "**the parties [had] not sought

25  construction of any terms in the [asserted] patents**, and this lack of dispute over the proper

26  construction of the asserted claims confirm[ed] that it [was] unnecessary to engage in claim

27  construction before addressing validity under Section 101."  *Id.*, 2014 WL 4684429 at *3.  The

28  Defendants also failed to point out that, in *OpenTV*, **the parties had already filed their**

1   **proposed claim constructions and fully briefed this Court as to any disputes related to the**

2   **claims of the asserted patent.** *See id.*, 2015 WL 1535328 at *3.

3          This case is clearly distinguishable from *Open Text* and *OpenTV*, as the parties to this

4   action have not filed their proposed claim constructions with the Court, and the parties have not

5   in any way briefed the Court as to any disputes related to the claims of the '789 patent.  Indeed,

6   whereas Plaintiff alleges that the SEEQ MCT System is indeed a "**self-defense** system" (*see,*

7   *e.g.,* Docket No. 9, page 8, ¶ 60) as recited in all 17 claims of the '789 patent, the Defendants

8   explicitly state in their motion to dismiss, "The SEEQ product is not intended for use as a '**self-**

9   **defense**' device" (Docket No. 27, page 1, lines 24-25).  There is clearly a dispute between the

10  opposing parties as to the correct construction of the term "self-defense".  Additionally, there is

11  also evidence (as will be explained herein) of a fundamental dispute between the opposing

12  parties as to the correct construction of the language "pressure sensor unit configured to generate

13  a pressure input signal", as recited by independent claims 1 and 17 of the '189 patent, which in

14  turn effects the proper constructions of claims 2-16, which each depends from claim 1.

15         Moreover, in so much as the parties have not yet filed their proposed claim constructions

16  with the Court, it is not yet possible to identify the various disputes to the claims of the '789

17  patent that are relevant to the § 101 inquiry.  Indeed, the Federal Circuit has already explained

18  that, in order to obtain the mandated "full understanding of the basic character of the claimed

19  subject matter", "it will **ordinarily be desirable—and often necessary**—to resolve claim

20  construction disputes prior to a § 101 analysis …." *Bancorp*, 687 F.3d at 1273-1274.  Plaintiff

21  respectfully submits that the complexity of the technology at issue in this action, which includes

22  a combination of mechanical, electrical and software (e.g., firmware) components, as well as the

23  integration of wireless transmitters and receivers, raises this technology at least to the Federal

24  Circuit's "desirable" threshold, if not all the way to the Federal Circuit's "necessary" threshold,

25  with respect to resolving claim construction disputes prior to a § 101 analysis.

26         In view of the foregoing, the subject motion to dismiss is clearly premature and therefore

27  procedurally improper; as such, this motion cannot be adequately considered at this early

28  juncture and should therefore be denied.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## VI.   THE MOTION SHOULD BE DENIED BECAUSE THE DEFENDANTS ATTEMPTED TO WITHHOLD RELEVANT INFORMATION FROM THIS COURT

The Defendants state in their motion, "[A] prior version of the SEEQ product, known as Nuvant, **predates** the asserted patent by several years (see, e.g., FDA 510(k) file K091971)." Docket No. 27, page 1, lines 24-26.  When the Defendants made this statement in their motion to dismiss under Rule 12(b)(6), they indicated their belief that this earlier version of the SEEQ MCT System already included the relevant features at issue in the claims of the '789 patent. However, in **2009**, the SEEQ MCT System, which was previously branded the NUVANT® MCT System, was described to the U.S. Food and Drug Administration (FDA) in a 510(k) premarket notification as comprising, *inter alia*, a "Patient Trigger **Magnet**".  *See* FDA 510(k) file K091971, page 4, sec. 3.b.  The addition of the Patient Trigger Button to the SEEQ MCT System was not disclosed to the FDA until **2014**.  *See* FDA 510(k) file K133701, page 2, sec. 5.1 ("Please note that the only changes in the Device Description relate to **replacing** the patient trigger magnet with a **button**"); *see also id.* at page 10 (stating that this document was received by the FDA on January 8, 2014).  These FDA documents have been made publicly available by the U.S. government on the FDA website; FDA 510(k) file K091971 can be downloaded at:

https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpmn/pmn.cfm?ID=K091971,

and FDA 510(k) file K133701 can be downloaded at:

https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpmn/pmn.cfm?ID=K133701.[3]

As such, this documentation can be considered by the Court when ruling on the subject motion to dismiss under Fed. R. Evid. 201(b).  *See Daniels-Hall*, 629 F.3d at 998.  Indeed, the Defendants opened the door to this FDA documentation when they specifically referenced FDA 510(k) file K091971 in their motion to dismiss.  Docket No. 27, page 1, lines 25-26.

_____

[3] The Submitter Name on both of these documents is listed as Corventis, Inc., which is a previous corporate name of Defendant Medtronic Monitoring, Inc.  The following provides a current hyperlink to this entity's past registrations with the Office of the California Secretary of State:
https://businesssearch.sos.ca.gov/CBS/SearchResults?SearchType=CORP&SearchCriteria=medtronic+monitoring&SearchSubType=Keyword

The fact that FDA 510(k) file K091971, to which the Defendants refer in their own motion to dismiss, discloses a "Patient Trigger **Magnet**" (*see id.*, page 4, sec. 3.b.), and the fact that the replacement of this Patient Trigger Magnet with the Patient Trigger **Button** was not disclosed to the FDA until 2014 in FDA 510(k) file K133701, is incredibly relevant to whether there are disputes over the proper constructions of the asserted claims upon which the Court should be fully briefed (s*ee, e.g., OpenTV*, No. 14-CV-01622-HSG, 2015 WL 1535328 at *3), which in turn is relevant to the Court's determination as to whether the § 101 inquiry has been properly raised on the subject motion to dismiss under Rule 12(b)(6), or whether such an inquiry has been prematurely raised, as explained *supra* in Section V of this Opposition.  Indeed, Plaintiff has already indicated that its construction of the "pressure sensor unit configured to generate a pressure input signal" of claim 1 is analogous to the Wearable Sensor of the SEEQ MCT System in view of the Patient Trigger **Button** being integrated with that Wearable Sensor. *See* Docket No. 9, page 9, ¶ 70:

> The Wearable Sensor is analogous to the "pressure sensor unit integrated with a wireless transmitter, said pressure sensor unit configured to generate a pressure input signal", as recited in Independent Claim 1, at least because (1) **the Wearable Sensor generates a signal when a user pushes the Patient Trigger Button** and (2) the Wearable Sensor must be integrated with such a wireless transmitter in order to be able to wirelessly transmit information to the Transmitter.

To the extent that the Defendants' construe the claim term "pressure sensor unit" as being analogous to the Patient Trigger **Magnet** of the earlier version of the SEEQ MCT System, a significant claim construction dispute has developed in this action, particularly when the replacement of the Patient Trigger Magnet with the Patient Trigger button caused Defendant Medtronic Monitoring, Inc. to have to file another 510(k) premarket disclosure with the FDA in 2014 to thereby inform the FDA of a fundamental change in the technology of the SEEQ MCT product line.

Thus, once the Defendants decided to rely upon FDA 510(k) file K091971 in their motion to dismiss, they had a duty to disclose this relevant information to the Court.  Instead, they did not disclose this relevant information to the Court, nor did they disclose FDA 510(k) file

K133701 in their motion.[4]   As such, the Defendants have attempted to deceive the Court by withholding information relevant to this Court's procedural precedent in *Open Text* and *OpenTV*, which are cases upon which the Defendants' rely (*see* Document 27, page 5, lines 1-5).   Plaintiff therefore respectfully requests that the subject motion to dismiss under Rule 12(b)(6) be denied.

## VII.   THE MOTION SHOULD BE DISMISSED BECAUSE THE ASSERTED CLAIMS ARE ELIBIBLE UNDER § 101

### A.   The Court should apply a "clear and convincing" evidence standard when determining validity of the '789 patent

Under 35 U.S.C. § 282(a), every claim of the '789 patent is presumed valid, and the Defendants have the burden of proof for establishing invalidity of the '789 patent.   In view of this statute-mandated presumption of patent validity, as well as the weight of authority that has developed in recent years since *Alice* was decided by the U.S. Supreme Court in 2014 indicating that a "clear and convincing" evidence standard as to subject matter eligibility should be applied at the motion to dismiss stage, Plaintiff respectfully requests that this Court apply a "clear and convincing" evidence standard to the § 101 inquiry raised by the Defendants in their motion to dismiss under Rule 12(b)(6).   *See* 35 U.S.C. § 282(a); *SkillSurvey, Inc. v. Checkster LLC*, 178 F.Supp.3d 247, 254-255 (E.D. Pa. 2016) (distinguishing *OpenTV*), *aff'd* in non-precedential opinion *SkillSurvey, Inc. v. Checkster LLC*, No. 16-1994 (Fed. Cir. 2017).

### B.   The asserted claims of the '789 patent pass step 1 of the *Alice* test:   The claims are not directed to an abstract idea

For step 1 of the *Alice* test, the Court must "determine whether the claims at issue are directed to a patent-ineligible concept", such as an "abstract idea".   *Alice*, 134 S. Ct. at 2355. Plaintiff respectfully submits that the Defendants have failed to meet their burden of establishing that the claims of the '789 patent are directed to a patent-ineligible concept for a number of reasons.

*First*, the Defendants argue that the claims of the '789 patent are directed to the abstract idea of "self-defense".   Docket No. 27, page 8, lines 17-18.   Additionally, the Defendants'

---

[4] Indeed, the Defendants did not even disclose where these documents can be downloaded via the Internet.

analysis under step 1 of the *Alice* test references the human nervous system in combination with additional equipment that is not part of the human nervous system (e.g., stun gun, pepper spray, protective gear, camera and GPS tracking device).  As such, the Defendants attempt to categorize **the entire field of "self-defense"** as a protected abstract idea under *Alice*.  Docket No. 27, page 8, lines 21-24 (citations omitted).  However, the courts have never declared the entire field of "self-defense" to be an abstract idea, nor do the Defendants argue that they have.

*Second*, the Defendants attempt to link the entire field of "self-defense" to human-performed steps, noting that the Federal Circuit has already established that "section 101 'excludes the subject matter of certain claims that by their terms read on . . . a human-controlled series of physical acts' **if directed to an abstract idea**".  Docket No. 27, page 8, lines 24-28, citing *buySAFE, Inc. v. Google Inc.*, 765 F.3d 1350, 1353 (Fed. Cir. 2014).  However, as can plainly be seen in this citation, in order to apply the Federal Circuit's "human-controlled" standard to this particular action, the Defendants would have needed to have first established that the entire field of "self-defense" is in fact an abstract idea, but they have not done so.

*Third*, in the event that the Defendants attempt to reframe their proposed abstract idea as being the human nervous system, it should be appreciated that the Defendants' own human nervous system examples are fundamentally flawed.

With reference to claim 1, for example, the Defendants compare (i) the claimed "appendage" to a person's head, arm or leg, (ii) the claimed "material" to a helmet, clothing, shield or armor sized to conform to such a body part, (iii) the claimed "pressure sensor unit" to human skin integrated with neural transmitters that are configured to transmit signals, and (iv) the claimed "defense unit" to the person's brain, wherein the brain "is configured to receive such signals and initiate a defense event (e.g., lifting of arm or leg) in response to the transmitted signals." *See, e.g.,* Docket No. 27, page 9, lines 4-25.  In so much as human skin cells are not themselves capable of generating a "pressure input signal" that is transmitted to the brain, Plaintiff understands the Defendants' argument to indicate that human skin in combination with the integrated neural transmitters (i.e., nerve cells) are analogous to the claimed "pressure sensor unit".  From this premise, Plaintiff points out that integrating such neural transmitters (i.e., nerve

cells) with a "wireless transmitter", as claimed, does not exist in nature, nor does integrating a human brain with a "wireless receiver", as claimed. Rather, Plaintiff finds that a human being would need to be surgically altered to achieve this end, wherein the neural transmitters (i.e., nerve cells) are surgically integrated with a wireless transmitter, and wherein the brain is surgically integrated with a wireless receiver. As such, not all of the steps of claim 1, and similarly of claims 2-17, of the '789 patent can be performed by the human nervous system, and Plaintiff submits that the type of surgical modification to a human being that would be necessary to achieve claim 1 is not in any way conventional. Consequently, the claims of the '789 patent do not in any way **preempt** the natural, conventional uses of the human nervous system.

That being said, it is also relevant during the first step of the *Alice* test to consider whether the claims of the '789 patent are directed to an improvement in self-defense systems. *See Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016). In comparison to the Defendants' human nervous system example, which the Defendants have proffered as being a conventional self-defense system, the wireless transmission of a "pressure input signal" enables the "pressure sensor unit" in the claimed "self-defense system" to be positioned farther away from the "defense unit" than can be achieved with the human body alone, thereby increasing the number of possible self-defense implementations. Indeed, the specification of the '789 patent states:

> When pressure sensor unit 1210 senses applied pressure 1220, pressure input signal 1230 is wirelessly routed to defense unit 140. In this manner, one or more pressure sensors associated with pressure sensor unit 1210 may be positioned at different locations on a user's body, **or elsewhere.**

*Id.* 12:45-52. Furthermore, by being directed to a self-defense system that enables a person to specifically avoid the human body's own pressure input signal delivery system, the claimed embodiments provide technological architectures specific to the field of "self-defense" that are not hindered by many of the problems that can develop within that system, such as, for example, nerve damage, neuropathy, and chemical imbalances or overdoses that can affect the electrochemical routing of signals to the brain. Thus, the claims of the '789 patent are "directed to" a specific improvement in self-defense systems that necessarily prevents these claims from

being "directed to" an abstract idea; as such, "their character **as a whole** is directed to" eligible subject matter." *Enfish*, 822 F.3d at 1335.

For at least these reasons, each of the claims of the '789 patent pass the step 1 of the *Alice* test, and the Defendants' motion to dismiss should be denied.

### C.   The asserted claims of the '789 patent pass step 2 of the *Alice* test:  The claims recite an inventive concept sufficient to transform each of the claims into a patent-eligible application of the idea

Even if the Court were to determine that the claims are directed to a patent-ineligible concept, the Court must then "consider the elements of each claim **both individually and 'as an ordered combination'** to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Alice*, 134 S. Ct. at 2355, citing *Mayo*, 132 S. Ct. at 1298, 1297.  With regard to the consideration of the individual claim elements, Plaintiff submits that this is not appropriate (or even possible) at this early juncture being that the parties have not yet filed their proposed claim constructions nor fully briefed this Court as to disputes related to these terms (*see OpenTV*, 2015 WL 1535328 at *3) such that this Court could have already acquired the "full understanding of the basic character of the claimed subject matter" (*Bancorp*, 687 F.3d at 1273-1274) required by the Federal Circuit.  However, even if the Court (after having acquired this requisite understanding) were to determine that various individual elements of the claims of the '789 patent are "known, conventional pieces", the claimed combinations nevertheless constitute "non-conventional and non-generic arrangements" of such elements that qualify as patent-eligible subject matter.  *X One, Inc. v. Uber Technologies, Inc.*, 239 F.Supp.3d 1174, 1196 (N.D. Cal. 2017), citing *Bascom Global Internet Servs., Inc. v. AT & T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016).

Beginning now with claim 1, even if the Court were to determine that the claimed elements are conventional on their own, the specific, claimed combination of these elements is not in any way conventional.  The fact that the human nervous system does not include "a wireless transmitter" and "a wireless receiver" is clear from Plaintiff's analysis under step 1 of the *Alice* test, as is the fact that the human nervous system does not have such a wireless transmitter and wireless receiver specifically integrated with a "pressure sensor unit" and a

1   "defense unit", respectively, wherein the wireless receiver is specifically "configured to

2   wirelessly receive said pressure input signal from said wireless transmitter".  As such, when

3   analyzing the elements of claim 1 as an ordered combination, the proffered human nervous

4   system example very quickly unravels.  Thus, claim 1 includes additional features that limit its

5   scope in a meaningful way such that it does not preempt every application of the broad field of

6   "self-defense".

7          Additionally, it is noted that claims that do "no more than **require a generic computer** to

8   perform **generic computer functions**" do not pass step 2 of the *Alice* test.  *Alice*, 134 S. Ct. at

9   2359.  However, the Defendants have failed to meet their burden under the "generic computer"

10  test in *Alice*.  In particular, the Defendants have not met their burden of identifying a generic

11  computer that includes all of the elements of claim 1, as an ordered combination, and the

12  Defendants have also not met their burden of demonstrating that the functions recited in claim 1

13  would necessarily be performed by such a generic computer.  Indeed, whereas the Defendants

14  appear to focus their argument on the claimed elements individually, when applying the *Alice*

15  test, "patent claims 'must be **considered as a whole**.'"  *See Alice*, 134 S. Ct. at 2361, Footnote 3,

16  citing *Diamond,* 450 U.S. at 188; *Parker v. Flook*, 437 U.S. 584, 594 (1978).

17         Claim 1 is not directed to a "generic computer".  For example, not all computers are

18  equipped with "a wireless transmitter" as well as "a wireless receiver configured to wirelessly

19  receive" a signal, such as "a pressure input signal", from that wireless transmitter.  Additionally,

20  not all computers are equipped with "a defense unit" that is specifically "configured to initiate a

21  defense event based on said pressure input signal".  Indeed, specifically programming or

22  modifying a general purpose computer to perform a specific function (e.g., the initiation of a

23  defense event) necessarily transforms that computer into something else.  Consequently, claim 1

24  absolutely does "more than require a generic computer to perform generic computer functions"

25  (*Alice*, 134 S. Ct. at 2359), and, even if the Court did determine that the individual elements of

26  claim 1 are conventional on their own, the specific ordered combination or those elements in

27  combination with the recited functionality necessarily transforms these elements into something

28  "significantly more than a patent upon [an ineligible concept] itself' " (*Alice*, 134 S. Ct. at 2355,

1  citing *Mayo*, 132 S. Ct. at 1294).  Thus, claim 1 includes additional features that limit its scope in

2  a meaningful way such that it does not preempt every application of the individual elements

3  recited in claim 1.

4  Claim 1 specifically integrates "a wireless receiver" and "a wireless transmitter" in a way

5  that provides a technical improvement over conventional self-defense systems.  Additionally,

6  and with reference still to the ordered combination of the recited elements, the architecture of

7  claim 1 provides a specific, tailored solution that is directly tied to a specific technological

8  challenge of how to selectively attach pressure sensors to key locations on a human body, or

9  elsewhere, to thereby maximize the effectiveness of the implemented self-defense system in

10  order to overcome "obstacles to self-preservation" for the "the overall protection of life and

11  limb".  *See, e.g.,* the '789 patent at 1:13-20; 12:45-13:4.  Moreover, it should be appreciated that

12  the issue of **how** to selectively attach pressure sensors to key locations on a human body, or

13  elsewhere (e.g., on a user's purse), based on the importance of such locations to the overall self-

14  defense objective did not arise until the creation of electronic self-defense systems.

15  In addition to reciting all of the features of claim 1 (e.g., "said defense unit configured to

16  initiate a defense event based on said pressure input signal"), claim 8 also recites, *inter alia*, "a

17  manual selector … configured to generate a manual execution signal", wherein the defense unit

18  is "configured to initiate said defense event based on said manual execution signal".  Thus, claim

19  8 requires that the defense unit be configured to initiate the defense event based on **both** of the

20  pressure input signal and the manual execution signal, and this very specific, dual-signal

21  configuration for initiating a defense event causes the "self-defense system" of claim 8 to be

22  even further differentiated from a general purpose computer.  Furthermore, the architecture of

23  claim 8 provides a specific, **dual-factor, safety solution** that is directly tied to specific

24  technological challenge (that did not arise until the creation of electronic self-defense systems) of

25  how to "minimize false positives" so as to prevent a defense event from being initiated at the

26  wrong time.  *See, e.g.,* the '789 patent at 13:51-53 ("[I]n order to minimize false positives, one

27  embodiment provides that a defense event is initiated in response to two different conditions

28  occurring ….").  *See also id.*, at 11:8-10, indicating that the two conditions may be "a manual

1    input caused by a selection of a manual selection mechanism" and "the sensing of a physical

2    pressure by a pressure sensor …."

3         Claim 9 recites, *inter alia*, "wherein said defense unit comprises: a conductive energy

4    device". The Defendants state that this "conductive energy device" is exemplified by a generic

5    "stun gun". *See* Docket 27, page 16, lines 8-9, citing the '789 patent at 11:28-30; 16:3-7.

6    However, and assuming arguendo that the Defendants' proposed construction of this term is

7    accurate, a stun gun is not a component of a general purpose computer, nor does a general

8    purpose computer specifically have a "defense unit" that comprises a stun gun. Moreover, the

9    architecture of claim 9 provides a specific solution that is directly tied to the specific

10   technological challenge (that did not arise until the creation of electronic self-defense systems) of

11   **how** a defense event is to be carried out by a self-defense system for purposes of the "overall

12   protection of life and limb." *See* the '789 patent at 1:19-20; see also *id.,* at 7:11-17.

13        Claim 16 recites, *inter alia*, "[t]he self-defense system of claim 1, **further comprising:**

14   an audio output unit", and the Defendants argue that this "audio output unit" is a "generic audio

15   speaker". *See* Docket 27, page 16, lines 10-12, citing the '789 patent at 18:67-19:3. However,

16   the Defendants fail to point out that the audio output unit is integrated into the "self-defense

17   system" of claim 16 such that this audio output unit is both (i) distinct from the "defense unit

18   configured to initiate a defense event based on said pressure input signal" (in view of the "further

19   comprising" language) as well as (ii) specifically configured to "access preselected audio data

20   based on said pressure input signal". This very specific architecture is not included in a general

21   purpose computer. Moreover, the architecture of claim 16 provides a specific solution that is

22   directly tied to the specific technological challenge (that did not arise until the creation of

23   electronic self-defense systems) of how to both minimize the harm caused by an attack and alert

24   third-party bystanders to the attack (*see, e.g.,* the '789 patent at 18:52-19:20).

25        Claim 17 is similar to claim 1, but recites, *inter alia*, "a manual selector configured to

26   generate a manual execution signal". While it could be argued that a general purpose computer

27   is equipped with such a manual selector, claim 17 requires that the defense unit be specifically

28   configured to "initiate a defense event in response to **either** of said pressure input and manual

execution signals." This very specific configuration for initiating a defense event is distinguishable from a general purpose computer. Moreover, the architecture of claim 17 provides a specific solution that is directly tied to the specific technological challenge (that did not arise until the creation of electronic self-defense systems) of how to provide multiple options for initiating a defense event with an implemented self-defense system for purposes of the "overall protection of life and limb." *See* the '789 patent at 1:19-20. *See also id.*, at 11:7-15, indicating that a defense event may be initiated based on "a manual input caused by a selection of a manual selection mechanism" or "the sensing of a physical pressure by a pressure sensor".

Regarding claims 2-7 and 10-15 of the '789 patent, Plaintiff will likely request to assert one or more of these claims if discovery identifies one or more of these claims as being applicable to this action. Each of claims 2-7 and 10-15 pass step 2 of the *Alice* test at least because of their respective dependencies on claim 1. In addition, please note the following:

With respect to claim 2, a general purpose computer does not have a "comparator configured to conduct a comparison of two electronic signals and generate an execution signal based on said comparison," wherein "said defense unit [is] configured to **initiate *[sic]* defense event based on said execution signal**. Moreover, the embodiment of claim 2 can be implemented to solve various safety-related problems in a self-defense system, as will be now be discussed with reference to claims 5-7.

Claim 5 not only recites "a comparator", but also a specific, detailed architecture that is absent from a generic computer system. Additionally, this architecture provides a **safety feature** that is directly tied to the specific technological challenge (which did not arise until the creation of electronic self-defense systems) of how to **prevent** a defense event from being initiated in response to relatively small, trace amounts of electricity. Indeed, the '789 patent is explicitly concerned with the problem of "false positives" in a self-defense system (*see, e.g.,* the '789 patent at 12:65-13:4; 13:49-56." The particular architecture of claim 5 integrates a "threshold voltage" into the comparison conducted by the comparator such that "an automatic execution signal" is generated by the comparator "in response to an absolute value or magnitude of at least one of … one or more signal amplitudes being above an absolute value or magnitude of said

1  threshold voltage," wherein "said defense unit [is] configured to initiate said defense event based

2  on said automatic execution signal."  Indeed, the architecture of claim 5 (and similarly claim 2)

3  can be implemented, for example, to prevent a defense event from being initiated when the

4  magnitude of a signal amplitude of a pressure input signal is below the implemented threshold

5  voltage to thereby prevent a false positive based on small, trace amounts of electricity.

6      With respect to claim 6, a general purpose computer does not comprise "a cardio unit",

7  and certainly does not comprise a cardio unit that is specifically "configured to generate a heart

8  rate input signal in response to a detected heart rate being above a heart rate threshold".

9  Additionally, claim 6 is also directed to a very specific, detailed architecture that is absent from a

10  generic computer system.  Similarly, not only does claim 7 recite "an audio input unit", but claim

11  7 is also directed to a very specific, detailed architecture that is absent from a generic computer

12  system.  Furthermore, the architecture of claim 6 provides a specific, **dual-factor, safety**

13  **solution** that is directly tied to specific technological challenge (that did not arise until the

14  creation of electronic self-defense systems) of how to "minimize false positives" so as to prevent

15  a defense event from being initiated at the wrong time.  *See* the '789 patent at 13:49-56, stating:

16      in order to minimize false positives, one embodiment provides that a defense event is
        initiated **in response to two different conditions occurring, such as** when (1) a detected
17      heart rate 1530 is above a heart rate threshold 1540 and (2) pressure sensor unit 1210
        senses an applied pressure 1220 above a predetermined pressure threshold.
18

19  The use of the language "such as" in this statement makes it clear that the two example

20  conditions mentioned in this statement are merely examples.  Indeed, the architecture of claim 7

21  also provides a specific, dual-factor, safety solution that is directly tied to specific technological

22  challenge (that did not arise until the creation of electronic self-defense systems) of how to

23  "minimize false positives" so as to prevent a defense event from being initiated at the wrong

24  time.  Similarly, the architecture of claim 2 can be implemented, for example, to prevent a

25  defense event from being initiated in response to a false positive by ensuring that two different

26  conditions precedent to the initiation of a defense event have indeed occurred.

27      With respect to claim 3 (and similarly claim 10), the Defendants argue that the recited

28  "projector unit[]" and a "conductive energy device[]" are exemplified by "pepper spray" and "a

18

1    stun gun", respectively.  *See* Docket 27, page 16, lines 27 and 28.  Assuming arguendo that the

2    Defendants' proposed constructions of these terms are accurate, a general purpose computer is

3    not equipped with either pepper spray or a stun gun.  Moreover, claim 3 depends from claim 2,

4    and therefore incorporates the same inventive concept as claim 2.  Furthermore, the architectures

5    of claims 3 and 10 provide specific solutions that are directly tied to the specific technological

6    challenge (that did not arise until the creation of electronic self-defense systems) of **how** a

7    defense event is to be carried out by a self-defense system for purposes of the "overall protection

8    of life and limb" (*see* Patent '789, 1:19-20).

9            Claim 4 includes the "material **sized to conform to an appendage**" of claim 1, and

10   further recites "one or more armor units **coupled with said material** and **sized to conform to a**

11   **shape of said appendage**."  The Defendants do not explain how a general purpose computer

12   would necessarily be equipped with each of these elements.  The Defendants have therefore not

13   satisfied their burden with respect to claim 4.  Moreover, the architecture of claim 4 provides a

14   specific solution that is directly tied to the specific technological challenge (that did not arise

15   until the creation of electronic self-defense systems) of **how** a self-defense system should be

16   implemented for purposes of the "overall protection of life and limb" (*see* Patent '789, 1:19-20).

17           Claim 11 is directed to a very specific, detailed architecture that is absent from a generic

18   computer system.  For example, a general purpose computer does not have a force applicator that

19   is specifically positioned to:

20                  i. apply [a] force to [a] nozzle or container in [a] preselected direction and above [a]
             preselected magnitude in response to an engagement signal such that [a] first amount of
21           [a] substance is released from said container, and

22                  ii. decrease a magnitude of said force below said preselected magnitude in response to
             a disengagement signal such that a release of a second amount of said substance from
23           said container is prevented;

24   as claimed.  Moreover, a general purpose computer does not have a controller unit that is

25   specifically positioned to "generate said engagement and disengagement signals based on said

26   pressure input signal."  Furthermore, the architecture of claim 11 provides a specific, detailed

27   solution that is directly tied to the specific technological challenge of how to release certain

28   amounts of a substance from a container that is integrated into an electronic self-defense system.

Claim 11 is specifically directed to a **multi-element, control system** that solves this problem. *See, e.g.,* the '789 patent at 8:31-9:35.

Claims 12-15 not only recite "an audio input unit", "an image input unit", "a video input unit" and "a geolocation unit", respectively, but also provide specific solutions that are directly tied to the specific technological challenges of **how** to integrate these elements into a self-defense system such that "specific information is captured" "during an initiated defense event" and such that this captured information can be, for example, "recorded and/or transmitted to one or more preselected entities, such as … emergency medical responders. *See* the '789 patent at 16:45-50.

Thus, even if the Court were to identify a patent-ineligible concept at issue here, the claims of the '789 patent recite inventive concepts sufficient to transform any such patent-ineligible concept into patent-eligible subject matter.  As such, each of the claims of the '789 patent pass the step 2 of the *Alice* test, and the Defendants' motion to dismiss should be denied.

## VIII.   <u>CONCLUSION</u>

For at least the foregoing reasons, Plaintiff respectfully requests that the Court deny the Defendants' Motion to Dismiss Plaintiff's First Amended Complaint on the grounds that (i) the inquiry under 35 U.S.C. § 101 has been raised prematurely in the subject motion to dismiss under Rule 12(b)(6), (ii) the Defendants acted improperly by attempting to withhold relevant information from the Court, and (iii) the claims of the '789 patent are directed to patent-eligible subject matter under § 101.

Date:  <u>September 13, 2017</u>        By:    <u>/S/ Jerry A. Crandall</u>

Jerry A. Crandall (CSB No. 250192)
jac@crandalltech.com
CRANDALL TECHNOLOGIES LLC
1590 Heavenly View Trail
Reno, NV 89523

*Attorney for Plaintiff*
*Crandall Technologies LLC*

1

## CERTIFICATE OF SERVICE

2

The undersigned certifies that on September 13, 2017, the foregoing Plaintiff's

3

Opposition to Defendants' Motion to Dismiss and all supporting documents were filed with the

4

Clerk of the U.S. District Court for the Northern District of California, using the Court's

5

Electronic Case Filing (ECF) system, in compliance with Civil L.R. 5-1 and General Order 45.

6

The ECF system serves a "Notice of Electronic Filing" to all parties and counsel who have

7

8

appeared in this action and who have consented under Civil L.R. 5-1 and General Order 45 to

9

accept that Notice as service of this document.

10

11

Date:   September 13, 2017            By:     /S/ Jerry A. Crandall

12

Jerry A. Crandall (CSB No. 250192)
jac@crandalltech.com

13

CRANDALL TECHNOLOGIES LLC

14

1590 Heavenly View Trail
Reno, NV 89523

15

16

*Attorney for Plaintiff*
*Crandall Technologies LLC*

17

18

19

20

21

22

23

24

25

26

27

28