Pages 1 - 13

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Haywood S. Gilliam, Jr., Judge

```
CRANDALL TECHNOLOGIES, LLC,    )
                               )
          Plaintiff,           )
                               )   No. CV 17-3664 HSG
     vs.                       )
                               )
MEDTRONIC, INC., et al.,       )
                               )   Motion Hearing
          Defendants.          )
_____)
```

Oakland, California
Thursday, December 7, 2017
2:21 p.m.

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:           CRANDALL TECHNOLOGIES LLC
                         1590 Heavenly View Trail
                         Reno, Nevada 89523
                    BY:  **JERRY CRANDALL, ATTORNEY AT LAW**


For Defendants:          ROPES GRAY LLP
                         191 North Wacker Drive, 32nd Floor
                         Chicago, Illinois 60606
                    BY:  **RICHARD T. MCCAULLEY, JR.**
                         **ATTORNEY AT LAW**



Reported by:   Sarah Goekler, CSR No. 13446, RMR, CRR, CCRR
               Official Reporter

*Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription*

```
 1   Thursday, December 7, 2017                            2:21 p.m.
 2                         P R O C E E D I N G S
 3                              ---o0o---
 4        THE CLERK:  We're calling C 17-3664, Crandall
 5   Technologies, LLC vs. Medtronic, Inc., et al.
 6        Please step forward and state your appearances for the
 7   record, please.
 8        MR. McCAULLEY:  Good afternoon, Your Honor.  Richard
 9   McCaulley on behalf of the Medtronic defendants.
10        THE COURT:  Good afternoon, Mr. McCaulley.
11        You should actually be on the other side.
12        MR. McCAULLEY:  Sorry about that.
13        MR. CRANDALL:  Good afternoon, Your Honor.  Jerry
14   Crandall for plaintiff Crandall Technologies.
15        THE COURT:  All right.  Good afternoon, Mr. Crandall.
16        All right.  So we're here for a hearing on both the motion
17   to dismiss on Section 101 grounds, filed by the defendant, as
18   well as the motion for leave to file a second amended
19   complaint, filed by the plaintiff.
20        I think we ought to take the Section 101 motion first.
21   And, really, this question is for Mr. McCaulley.  I've reviewed
22   the papers and the patent.
23        In a sentence, what is your articulation of the abstract
24   idea that, in your view, the patent is directed to?
25        MR. McCAULLEY:  Under the first step of the *Alice* --
```

1  I think, as we state -- the *Alice* analysis, Your Honor, as we
2  state in our briefing, the patent is directed to the abstract
3  idea of self-defense, sensing pressure and taking action to
4  defend one's self.
5        **THE COURT:**  All right.  So the -- as I thought about
6  it, though, isn't that too high level?
7       In other words, when you look at these *Alice* cases and
8  they talk about the abstract idea, it's generally a verb.  It's
9  "ing."  And so what is the "ing"?
10      I don't think you could say that self-defense is the idea.
11  It seems to me it's something like automating the discharge of
12  a self-defense mechanism based on natural intuitive or
13  reflexive human body movements or something like that.
14      What is your take?
15       **MR. McCAULLEY:**  Yeah.  I think you're -- I don't
16  fundamentally disagree with what you're saying.  I think, as we
17  state in our brief -- and I don't know if I have it word for
18  word.  But if I put the "ing" to it, as Your Honor said, it's
19  sensing danger and taking an action in response to that
20  sensation.
21      And as -- automating that response, I mean, that's
22  something that human beings have been doing since the days of
23  the saber-toothed tiger.  You sense pressure in a hostile
24  situation and you take action in response to that.  And
25  automating that with conventional technology doesn't remove it

1  from the realm.  It doesn't add enough to the abstract nature
2  of the sensing and taking action to render it patentable under
3  Section 101.
4            **THE COURT:**  All right.  Mr. Crandall.
5            **MR. CRANDALL:**  With respect to the abstract idea, I
6  think Your Honor can tell from my opposition brief I was a
7  little fuzzy on what the abstract idea was supposed to be.  It
8  seemed in certain instances it was the human nervous system and
9  in other instances it was the entire broad field of
10 self-defense.
11     To the -- to the extent that it could be narrowed to the
12 human nervous system, I think that's interesting.  But Step 1
13 of *Alice* is about determining what the claim is directed
14 toward.
15     And *Alice* makes it very clear that inventors are allowed
16 to use the fundamental building blocks of human ingenuity.
17 Those cannot be precluded.  To do so would ask an inventor to
18 essentially reinvent the wheel every time you come up with a
19 new idea.
20     If you look at Claim 1, the broadest claim in the claim
21 set, it's not directed to the human nervous system, per se.
22 But, rather, it's directed toward what a human being cannot
23 accomplish.
24     If you think of -- for instance, if you were camping in
25 the Mojave Desert around a campfire in rattlesnake territory

and you were to put a perimeter of pressure sensors around yourself just in case a rattlesnake were to cross over it in the middle of the night, those pressure sensors could wirelessly send a signal to a defense unit coupled with your arm. That's not something that the human nervous system, per se, can do.

So just based on Step 1 of *Alice*, the claim is directed towards something more than what the human -- a human being, per se, can do.

And that's actually addressed explicitly in the specification. When it talks about combining the wireless transmitter with the pressure sensor unit and the wireless receiver with the defense unit, it specifically says that the objective is to allow the pressure sensors to be placed on the person's body or elsewhere. So, essentially, it increases the number of applications and the range.

**THE COURT:** Right. But I don't think they're saying nor do they have to say that the abstract idea is the human nervous system.

The point is -- I have to confess. Looking at the patent, I've never seen one that is so express and thorough about saying that all of these examples are just exemplary. Essentially, as I read -- it's Column 5, lines 1 through 3:

> "Self-defense system is provided that makes use of a person's natural defensive posture when

1      initiating a defense event."
2          That's -- the question is, why is that not an abstract
3  idea?  And then the rest of the patent is, you could do it this
4  way or you could do it this way.  You could have pepper spray;
5  you could have a stun gun.  You could have something that makes
6  a sound.
7          You know, all of these alternatives are just ways that you
8  could put conventional technology together in the service of
9  that abstract idea.  And the defendants are arguing that that's
10 not enough under *Alice*, and I tend to think that that's a
11 substantial argument.
12             **MR. CRANDALL:**  Okay.  So -- well, with regards to the
13 example embodiments in the specification, obviously, the
14 specification is meant to provide enabling examples for how a
15 person having ordinary skill in the art could make and use the
16 claimed embodiment.
17         So the claims can't necessarily be limited only to those
18 example embodiments.  And that's, I think, what some of the
19 language you were getting at -- maybe that addresses some of
20 the language you were --
21             **THE COURT:**  Well, let me ask you.  I mean -- right.
22 Because, again, like I said, the patent at every possible term
23 says it's an exemplar; it's an embodiment.  But it has be
24 something; right?
25         And part of my longer-term question in this case is that

1  this is written so commodiously, that what I -- based on what I
2  know about the defendant's product -- and, obviously, I don't
3  have to address infringement at this stage.  But, you know, to
4  say that a heart rate monitor that notifies a central
5  monitoring location is a quote/unquote "self-defense system"
6  just tends to suggest that the patent is unbounded in what
7  could be swept under the ambit, if you take it at a high enough
8  level of generality.
9       So, again, looking at the summary of the invention:
10          "Self-defense system may included or comprise
11      material sized to conform to an appendage in position
12      to initiate a defense event in response to an input."
13      I know that's one with the material and the appendage and
14  all that.  But what is the -- if it's not essentially what I
15  said, which is the idea of taking your natural movements and
16  automating a self-defense response, what is it?
17      And, if I'm right about that, why is that not an abstract
18  idea under *Alice*, Step 1?
19          **MR. CRANDALL:**  No, I think an important part of the
20  claim is that a defense invent is initiated.  So there is a
21  degree of automation.  I absolutely agree with that.  And I
22  believe that -- I agree that a verb could be put in front of
23  that.
24      But the -- with regards to framing what the claim is
25  directing -- directed toward, it's the totality of the claim

1  that has to be looked at.
2          **THE COURT:**  Well, what -- what idea is it directed
3  toward, the claims?
4          **MR. CRANDALL:**  Well, the inventive idea would be
5  increasing the range with which pressure sensors can be
6  implemented in a self-defense system.
7          **THE COURT:**  Is that in the claims?
8          **MR. CRANDALL:**  It's indicated in the specification,
9  when it says that the purpose of that specific architecture is
10 to allow the pressure sensors to be positioned on the user's
11 body or elsewhere.
12         **THE COURT:**  You're saying that's just an exemplar?
13         **MR. CRANDALL:**  Except that that's the -- I'd have to
14 find it in the specification, but that -- in regards to that
15 specific architecture, that's the objective that's achieved.
16         **THE COURT:**  But, again, when you say "that specific
17 architecture," are you talking about an exemplary embodiment or
18 are you talking about the core that would apply to any
19 embodiment?
20         **MR. CRANDALL:**  I'm talking about the wireless
21 embodiment where the -- specifically that includes the
22 integration of wireless transmitter with the wireless -- or the
23 pressure sensor unit itself.
24         **THE COURT:**  All right.  Mr. McCaulley, anything
25 further from you?

1           **MR. McCAULLEY:**  Your Honor, I think where
2  Mr. Crandall's points fall down, if you read the case law as a
3  whole saying that you might be able to affect the rattlesnake
4  sensor idea, you may be able to do something perhaps more
5  quickly than a human being could do it -- more quickly than the
6  human being could take the abstract idea of sensing danger and
7  reacting, which is really what the claims are directed to.
8           If you use equipment to automate that -- a computer may be
9  able to do it more quickly; doesn't make it patentable.
10 There's references in the case law to, if the human mind could
11 do it with a pencil and a paper, the fact that a computer could
12 do it more quickly, the fact that a computer could do it more
13 reliably, the fact that a person might make a mistake doesn't
14 make it patent eligible; doesn't make it a valid patent claim.
15          And I think the focus on the claims and the abstract
16 nature of the claims and the broad nature of the way the
17 invention is claimed rather than the specific examples of being
18 able to find one instance in the examples, which still wouldn't
19 make it patent eligible, but one instance where you have a
20 certain array of sensors doesn't make the claims themselves
21 patent eligible.
22          I think there's examples in the specifications,
23 specifically at the top of Column 5, where it talks about the
24 fact where a person might not be able to get the pepper spray
25 out quickly enough.  But a person can use pepper spray in

1  response to sensing pressure and having a self-defense event.
2  The person can take action.  I just don't see anything here
3  that renders these claims patent eligible as they're drafted
4  and as they're presented to the Court.
5           **MR. CRANDALL:**  So, Your Honor, if I may?
6           **THE COURT:**  You can have the brief last word.
7           **MR. CRANDALL:**  So now we're getting into *Alice*,
8  Step 2, which -- is there an inventive concept, even if the
9  claims are directed to an abstract idea?
10     And this court last March in X One vs. -- in the *X One vs.*
11 *Uber* case, it addressed a case where you had the acquisition of
12 GPS information that was transmitted between wireless devices.
13      And, in that particular case, the Court ruled that there
14 was an abstract idea that the claims were directed toward and
15 that every single one of the elements were actually known
16 conventional elements.  Yet, the arrangement -- as a whole in
17 the *X* One case, this court held that the arrangement as a whole
18 was directed towards a nonconventional and nongeneric
19 arrangement in that particular field.
20      And, in so ruling, this court was following Federal
21 Circuit's 2016 precedent in *Bascom*, which is also mentioned in
22 my brief, where -- at issue in that case was a filtering
23 algorithm, and the Court said that content filtering is an
24 abstract idea.  And all they had done is combined it with a
25 known.

1       And the Court specifically stated a known aspect of
2  network technology, routing information from Point A to
3  Point B.  And the Court specifically said that, even though
4  each of these elements individually is not new, that by
5  combining each of these elements into a nonconventional and
6  nongeneric arrangement, the invention itself was directed
7  towards an inventive concept and that it presented a solution
8  that came over -- that overcame preexisting problems in that
9  particular field of content filtering.
10           **THE COURT:**  All right.  Again, I mean, I think this
11 goes to the breadth question.
12      I'm curious.  What do you think -- as to all these
13 exemplary embodiments, what is the common thread?  How are they
14 all examples of the same invention?  And, if so, what is the
15 invention?  That's what I'm getting at.
16           **MR. CRANDALL:**  So every single one of them involves a
17 pressure sensor actually sensing a pressure.  Okay.  So it's
18 not sensing magnetic fields; it's sensing a pressure.
19      Additionally, it has to do with a wearable technology.  So
20 that's clear throughout the specification.  And it's made clear
21 in Claim 1, which is an independent claim, and independent
22 Claim 17, there has to be a material size to conform to an
23 appendage.
24      And, additionally, there is the defense unit itself that
25 initiates a defense event in response to that pressure input

1  signal.  And "defense event" is defined in the specification.
2  There's a number of examples.  It could be, for example, a
3  discharge of electricity.  It could be a spraying of some
4  substance under pressure.  It could be routing information to
5  some preselected entity through a cellular network, which is
6  going to become important in this case, I think.
7       So there is definitely a common thread throughout all of
8  those example embodiments.
9            **THE COURT:**  All right.  And the thread is sensing
10 pressure --
11           **MR. CRANDALL:**  Sensing pressure and initiating --
12           **THE COURT:**  Hold on.
13      -- and then triggering one of many different types of
14 defense event based on that?
15           **MR. CRANDALL:**  Correct.
16           **THE COURT:**  Okay.  I don't have any other questions.
17      And I think the motion for leave, really, is subsidiary to
18 the motion to dismiss.  Obviously, if the motion to dismiss is
19 granted, the case is over.  If it isn't, then the usual liberal
20 standard would apply.
21      But I -- my read of the proposed additional claims and
22 counts is that they would rise and fall with the *Alice* motion
23 that's been made.  I don't see anything different about the
24 claims that are proposed.
25      And so I will take the two motions under submission and

```
 1   issue a ruling on them as soon as I can.
 2           MR. McCAULLEY:  Briefly, Your Honor.
 3      There is the allegation of willful infringement.  And I
 4   agree that, with your analysis of the claims, then they would
 5   rise or fall under 101.  But we don't think that the willful
 6   infringement allegation at the end is well pled and should not
 7   be allowed.
 8           THE COURT:  All right.  Understood.
 9           MR. McCAULLEY:  Thank you, Your Honor.
10           THE COURT:  All right.  Submitted?
11           MR. CRANDALL:  Thank you, Your Honor.
12           MR. McCAULLEY:  Your Honor, one housekeeping.
13      There is a motion to extend deadlines in the case that's
14   pending and that's been agreed to.  We did have a deadline that
15   came up last Friday and we complied with it.  But, if there's
16   any update on that on the schedule, just the -- it will impact
17   the parties' activities over the holidays.
18           THE COURT:  I'll take a look at it.
19           MR. McCAULLEY:  Thank you.
20           THE COURT:  You're welcome.
21               (Proceedings adjourned at 2:39 p.m.)
22                           ---o0o---
23
24
25
```

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Dated:  December 20, 2017

*Sarah L. Goekler*

Sarah L. Goekler, CSR 13446, RMR, CRR, CCRR

U.S. Court Reporter